Carlos Luis MEDINA, Plaintiff,

v.

**IOWA DISTRICT COURT FOR WOODBURY COUNTY,**
Defendant.

No. 95–1371.

Supreme Court of Iowa.

July 24, 1996.

Martha M. McMinn, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Ann E. Brenden, Assistant Attorney General, Thomas S. Mullin, County Attorney, and Clint Spurrier, Assistant County Attorney, for appellee State.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

NEUMAN, Justice.

Carlos Luis Medina refused to testify pursuant to a subpoena issued in connection with a murder prosecution against his half brother. Upon the State's application for a contempt citation, the district court ordered Medina imprisoned until he changed his mind about testifying. Medina now appeals the court's ruling, a challenge that we review as if brought by writ of certiorari. *See* Iowa R.App. P. 304. Because we believe substantial evidence supports the court's decision, we annul the writ.

The facts are not disputed. On February 26, 1993, Tonya Rubottom was sexually assaulted and murdered in Sioux City, Iowa. On the same date, Medina gave a videotaped statement to Sioux City police officers, placing himself at the scene of the crime and incriminating his half brother, Matthew Hallum. The State charged Medina with first-degree sexual abuse and first-degree murder.

Medina's videotaped statement was ultimately suppressed because the State failed to follow proper procedures for interrogation of a juvenile. *See* Iowa Code § 232.11(2) (1993). Medina thereafter rejected several favorable plea bargains offered in exchange for his testimony against Hallum. A jury acquitted Medina on the murder and rape charges, returning verdicts against him only on two counts of the lesser included offense of assault causing bodily injury. The court sentenced him to two concurrent one-year jail terms, suspended. His probation was subsequently revoked. At the time·of the contempt action now before us, he was incarcerated under his original sentence.

As part of its ongoing investigation in the Rubottom case, the State twice applied for subpoenas to depose Medina pursuant to Iowa Rule of Criminal Procedure 5. Medina appeared at the depositions pursuant to court order. When questioned about the events surrounding Rubottom's death, Medina invoked the Fifth Amendment and refused to answer.

At a hearing held in June 1995, the court advised Medina that because he had already been tried and convicted on lesser included offenses, he faced no further criminal jeopardy in connection with the Rubottom murder, and could claim no Fifth Amendment privilege. Moreover, the State sought—and the court granted—immunity for Medina on any related crimes. The court then specifically ordered Medina to answer questions posed by the county attorney regarding the sexual abuse and death of Rubottom. Further, the court warned Medina that if he continued in his refusal to answer questions, and the county attorney applied for a contempt order, a hearing would be set at which time the court would likely consider incarceration for an indefinite period until Medina testified as ordered.

Medina's persistent refusal to testify prompted a contempt hearing in July 1995. The district court rejected Medina's claim that the experience of his native American ancestors justified his silence, or that his prior unwillingness to accept plea bargains in exchange for testimony made it unlikely that incarceration would compel his testimony. The court ordered Medina's confinement in the Woodbury County jail until such time as he complied with the court's order to give deposition testimony. This appeal by Medina followed.

I. Certiorari is an action at law to test whether a tribunal—in this case, the district court—has exceeded its jurisdiction or otherwise acted illegally. *French v. Iowa Dist. Ct.*, 546 N.W.2d 911, 913 (Iowa 1996). Our review is for the correction of errors at law, not de novo. *Id.; Ervin v. Iowa Dist. Ct.*, 495 N.W.2d 742, 744 (Iowa 1993).

"No person may be punished for contempt unless the allegedly contumacious actions have been established by proof beyond a reasonable doubt." *Amro v. Iowa Dist. Ct.*, 429 N.W.2d 135, 140 (Iowa 1988). The question is whether substantial evidence supports the court's judgment by this requisite quantum of proof.

II. Contempt is established by proof of conduct "that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner has the right or not." *Amro*, 429 N.W.2d at

140. Use of the contempt power to force compliance with court orders and to compel testimony of witnesses is included among a court's inherent powers. *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627 (1966).

> [I]t is essential that courts be able to compel the appearance and testimony of witnesses.... Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance. The conditional nature of the imprisonment—based entirely upon the contemner's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury, provided that the usual due process requirements are met.

*Id.* at 370–71, 86 S.Ct. at 1535–36, 16 L.Ed.2d at 627 (citations omitted) (footnotes omitted).

Iowa Code section 665.5 specifically authorizes a district court to incarcerate a contemner for an indefinite period to coerce compliance with its order when "the contempt consists in an omission to perform an act which is yet in the power of the person to perform." Thus, this court has observed,

> [w]hen the prisoners carry "the keys of their prison in their own pockets," the action "is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees."

*State v. Longstreet,* 407 N.W.2d 591, 593 (Iowa 1987) (quoting *Shillitani,* 384 U.S. at 368–70, 86 S.Ct. at 1534–35, 16 L.Ed.2d at 626–27).

III. The record reveals ample evidence to support the trial court's finding of contempt beyond a reasonable doubt. Medina appeared at two hearings conducted to elicit testimony for use in the ongoing investigation of the Rubottom murder. He refused to cooperate on both occasions despite having previously given a statement about Rubottom's death immediately following the incident. The court informed Medina that he had no valid claim to a Fifth Amendment privilege and granted him immunity from any prosecution in relation to the case.

These facts support the court's finding that Medina's silence was motivated solely by the "bad or evil purpose" of protecting his half brother from prosecution for Rubottom's murder.

Medina does not seriously contest this finding. He instead asserts illegality in *the court's failure to make an individualized* determination that there exists a realistic possibility that indefinite incarceration for contempt will have the desired coercive effect. His argument rests principally on *Simkin v. United States,* 715 F.2d 34, 37 (2d Cir.1983).

*Simkin* involved a grand jury witness held in contempt for not divulging information about drug suppliers because of religious beliefs and fear of reprisal against himself and members of his family. *Id.* at 36. The United States Court of Appeals for the Second Circuit remanded the denial of application for release to the trial court with instructions to make an individualized decision on the likelihood confinement would have a coercive effect. *Simkin,* 715 F.2d at 38. Medina's reliance on *Simkin,* however, is misplaced. In *Simkin,* the contemner sought an individualized determination that *continued* incarceration was having a coercive effect. Medina seeks such a determination at the *commencement* of his incarceration. Even the *Simkin* court recognized the futility of making such a finding at an early stage of the proceedings:

> The judge need not, of course, accept as conclusive a contemner's avowed intention never to testify. Even if the judge concludes that it is the contemner's present intention never to testify, that conclusion does not preclude the possibility that continued confinement will cause the witness to change his mind.

*Simkin,* 715 F.2d at 37.

Here, the district court acted well within its discretion in jailing Medina, and that discretion continues as the coercion takes its toll. The district court found violation of its order beyond a reasonable doubt. Its finding shifted the burden to Medina to show his inability to comply. *Amro,* 429 N.W.2d at 141. Once the burden of produc-

tion has shifted, it remains with the contemner. Requiring the district court to make an individualized determination that incarceration will produce the intended conduct would effectively relieve the contemner of that burden.

■ A court has wide latitude in exercising its contempt powers. *See Simkin*, 715 F.2d at 38. "As long as the judge is satisfied that the coercive sanction might yet produce its intended result, the confinement may continue." *Id.* at 37. We recognize that the duration of coercive incarceration may be limited to a term commensurate with the rationale for the contempt finding. *Shillitani*, 384 U.S. at 372, 86 S.Ct. at 1536, 16 L.Ed.2d at 628; *Longstreet*, 407 N.W.2d at 594–95. At this stage, however, Medina's testimony is still of value in Hallum's ongoing prosecution. Likewise, Medina can free himself at any time by complying with the court order to testify.

The court's order of contempt was neither illegal nor beyond its jurisdiction. The writ is, therefore, annulled.

**WRIT ANNULLED.**