**POLK COUNTY SHERIFF, Plaintiff,**

v.

**IOWA DISTRICT COURT FOR POLK COUNTY, Defendant.**

No. 99–219.

Supreme Court of Iowa.

April 28, 1999.

John P. Sarcone, County Attorney, and Eliza Ovrom and Michael B. O'Meara, Assistant County Attorneys, for plaintiff.

Thomas J. Berg of Elverson, Vasey & Peterson, L.L.P., Des Moines, for defendant.

David Vestal, Des Moines, for amicus curiae Iowa State Sheriffs and Deputies Association.

LAVORATO, Justice.

This is a certiorari action to our court brought by the sheriff of Polk County seeking to reverse a district court decision denying the sheriff's application to compel jail inmate Jerrell Brown to submit to kidney dialysis treatment. We must decide whether the district court correctly found that Brown's liberty interest to refuse such treatment outweighs the State's countervailing interests to preserve life, prevent suicide, protect the interests of innocent third parties, maintain the ethical integrity of the medical profession, and maintain prison security, order, and discipline. We find that the State's interests must prevail. We therefore sustain the writ.

## I. Scope of Review.

■ The nature of the issues in this certiorari proceeding determines our review. *See Hancock v. City Council,* 392 N.W.2d 472, 473 (Iowa 1986). Certiorari is a law action to determine whether a tribunal—here, the district court—has exceeded its jurisdiction or otherwise acted illegally. *Medina v. Iowa Dist. Ct.,* 552 N.W.2d 140, 141 (Iowa 1996). Apart from constitutional issues, our review is therefore for correction of errors at law. *Hancock,* 392 N.W.2d at 473. Because Brown has raised constitutional issues in the proceedings before the district court, we make an evaluation of the facts from the totality of the circumstances. *Id.* Our review of the facts is therefore de novo.

## II. Facts and Proceedings.

The police arrested Brown on December 16, 1998, on charges of possession of a controlled substance with intent to deliver and failure to possess a drug tax stamp. At the time material to these proceedings, Brown was a Polk County jail inmate.

On February 24, 1999, the Polk County Sheriff filed an application in the district court asking the court to issue an order regarding emergency treatment for Brown. Apparently, Brown was refusing to continue with kidney dialysis treatment, which he had been receiving for about a year. The district court immediately ordered an evaluation of Brown's mental competency.

The next day, the district court held a hearing on the sheriff's petition. Iowa Lutheran Hospital intervened. Apparently, Brown had been receiving kidney dialysis treatments at this hospital.

The following facts were developed during the hearing. Brown is thirty-four years old. He has a medical condition known as nephrotic syndrome arising from

hypertension. This condition has rendered his kidneys minimally functional.

Brown has been receiving kidney dialysis (hemodialysis) treatments three days a week. As mentioned, he has been receiving such treatments for about a year. Each treatment lasts about three and one-half hours. An arterial venous fistula has been permanently inserted in his arm. Needles are inserted into this device each time Brown receives the kidney treatment. While receiving the treatment, Brown must sit for the three and one-half hours while the dialysis machine cleans his blood of toxins. Medical testimony revealed that the procedure is not painful and presents no serious side effects. Medical testimony also revealed that unless Brown receives the treatment, he would die within one week. Cardiac arrest would most likely cause his death. Continuing the treatment would allow Brown to live as long as twenty years.

According to the jail medical director, Dr. Roy Overton III, in the event Brown went into cardiac arrest, jail personnel would transport him to an emergency room at a local hospital. Without a do-not-resuscitate order or a living will, hospital personnel would take whatever measures necessary to save Brown's life. These measures would include intubating Brown, placing him on a respirator, inserting a catheter, and performing emergency dialysis. These medical procedures are more invasive than the regular dialysis treatment Brown has been receiving.

The jail medical director testified that he would honor a do-not-resuscitate order. He also testified that there are no Polk County jail inmates who have such orders in place. There was no evidence suggesting Brown has a do-not-resuscitate order or a living will in place.

Marvin Wilson is the chief jailer. He testified that in his twenty-three years at the jail, he has never known an inmate to have a do-not-resuscitate order. Wilson also testified that, even were there such an order, sheriff's deputies would still transport Brown to a hospital in case of a serious medical condition. Wilson pointed out that the jail is not a health care facility and sheriff's deputies would not honor do-not-resuscitate orders. According to Wilson, he would leave that decision to medical personnel.

Wilson testified that the sheriff has a duty to care for the safety, security, custody, and control of jail inmates and a duty to provide medical treatment to them, including Brown. Wilson had several concerns were the district court to allow Brown to refuse medical treatment. First, the other 600 inmates would be encouraged to refuse medical treatment as an excuse to get out of jail. Second, such an order would require jail personnel to exert more eyes-on supervision. This additional supervision would be required even if Brown were to execute a do-not-resuscitate order. Wilson indicated this level of supervision would be more than would be required for an inmate with a contagious medical condition or with a psychotic disorder.

Although Brown did not testify, he did state that he was refusing medical treatment "at this time." This was in response to a question from the judge conducting the hearing.

Dr. Michael Taylor, a psychiatrist, evaluated Brown the day before the hearing. Taylor testified Brown was competent, appeared to be of at least average intelligence, and understood the risks of his discontinuing the treatment. Taylor offered that Brown "knew more about the risks of stopping hemodialysis than some physicians in this state." According to Taylor, Brown said that spending any further time in any correctional facility was unacceptable and that he was going to stop his dialysis treatment "whether he was looking at another month, or another year, or another five years" in incarceration.

Taylor's report concerning the evaluation is in evidence. From it we learn that Brown expressed no particular concern

about the potential impact his refusal of treatment and certain death would have on his children. According to the report, Brown stated that he was tired of the routine of being taken to the hospital in jail garb and in manacles only to have to return to jail. The report quotes Brown as stating that "he has decided to refuse any future dialysis until March 4, 1999," which according to Brown was his pretrial conference date. When Taylor expressed doubt that Brown could live until March 4, Brown responded that he really did not care: "I'd be dead, so there would be nothing to worry about."

At the end of the evidence, the district court ruled from the bench. After making detailed findings of fact, the court, in a very thoughtful and thorough ruling, concluded that Brown's liberty interests under the Fourteenth Amendment were superior to the State's claim of reasonable governmental interests in compelling the dialysis treatment. The court overruled the sheriff's application for an order compelling the medical treatment.

The sheriff filed a petition for writ of certiorari with this court and requested an order requiring Brown to immediately undergo kidney dialysis treatment until we could hear the matter. Additionally, the sheriff requested that following the hearing we make the order permanent.

We granted the petition. In addition, we authorized the sheriff to compel Brown to submit to kidney dialysis treatment and, if ordered by a physician, forcibly administer such treatment to maintain Brown's life until we could address the merits of his case.

Following oral arguments, the sheriff notified us that the district court had released Brown from jail. The court had released Brown based on the State's motion to dismiss the charges against Brown prompted by a district court ruling sustaining Brown's motion to suppress. In a written motion, the sheriff has asked us to decide this case, even though the case is now moot.

## III. Mootness.

■ Ordinarily, we do not consider cases that are moot. *Shannon v. Hansen,* 469 N.W.2d 412, 414 (Iowa 1991). Nevertheless, we may decide to consider moot cases on grounds of public policy. *Id.* Generally, we consider three factors in making this determination: (1) the public or private nature of the question, (2) the desirability of authoritative adjudication for the future guidance of public officials, and (3) the likelihood of future recurrence. *Id.* Given the circumstances of this case, we think one additional factor is important: the likelihood that the issue may arise repeatedly, yet evade appellate review. *See Commissioner of Correction v. Myers,* 379 Mass. 255, 260, 399 N.E.2d 452, 455 (1979) (holding that question of inmate's right to refuse lifesaving treatment in an emergency situation is one of public importance, capable of repetition, yet evading appellate review; court considered issue even though moot, reasoning that other instances of inmate refusal could become factually moot by the mere passage of time before appeal, either because untreated inmate has died or has voluntarily submitted to treatment).

■ Having considered all four factors, we agree with the sheriff that we should decide this case. Clearly, the issue is one of public importance, and our decision would give guidance to penal authorities should they be faced with similar situations in the future. We are particularly persuaded by the sheriff's contention that there is a likelihood his office may have to deal with Brown in the future and again face his refusal of lifesaving medical treatment. In support of his contention, the sheriff points out that Brown has been incarcerated in the Polk County jail five times: in 1992, 1995, 1996, and twice in 1998. Given this past history, we must agree with the sheriff.

Moreover, we think this is a case capable of repetition, yet evading appellate re-

view. According to the sheriff's motion, the average stay in the Polk County jail is fifteen days. As the sheriff notes, given this relatively short duration of pretrial detention, an inmate who refuses lifesaving medical treatment would often be released from custody before an appellate court could ever decide whether the inmate should be allowed to refuse such treatment.

### IV. The Issue.

The issue is whether competent persons, while being held as pretrial detainees, have a constitutional right to refuse unwanted medical treatment. The district court held Brown had a liberty interest to refuse such treatment under the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. We therefore limit our analysis to the Federal Constitution.

### V. The Law Generally.

■ The Due Process Clause of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, *liberty,* or property, without due process of law." U.S. Const. amend. XIV (emphasis added). In *Cruzan v. Director, Missouri Department of Health,* the United States Supreme Court inferred from its prior decisions that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224, 241 (1990).

■ While recognizing that many state courts have held that a right to refuse treatment is encompassed by a generalized right of privacy, the Court declined to analyze the issue in terms of a privacy right. Instead, the Court believed the issue "is more properly analyzed in terms of a Fourteenth Amendment liberty interest." *Cruzan,* 497 U.S. at 279 n. 7, 110 S.Ct. at 2851 n. 7, 111 L.Ed.2d at 242 n. 7. Whether the State has violated a person's constitutional right to refuse treatment "must be determined by balancing his liberty interests against the relevant state

interests." *Id.* at 279, 110 S.Ct. at 2851–52, 111 L.Ed.2d at 242. Thus, the right to refuse treatment is not absolute.

In *Cruzan,* the Court focused on a state's interest in the protection and preservation of life. *Id.* at 280, 110 S.Ct. at 2852, 111 L.Ed.2d at 243. Other courts recognize this important countervailing state interest and in addition have generally recognized three other countervailing state interests: the prevention of suicide, the protection of the interests of innocent third parties, and the maintenance of the ethical integrity of the medical profession. *See, e.g., Thor v. Superior Ct.,* 5 Cal.4th 725, 738, 21 Cal.Rptr.2d 357, 365, 855 P.2d 375, 383 (1993). In the case of an incarcerated person, the state has an additional countervailing interest: maintaining prison security, order, and discipline. *Commonwealth v. Kallinger,* 134 Pa.Cmwlth. 415, 420, 580 A.2d 887, 890 (1990).

### VI. Analysis.

■ **A. Preserving life.** While courts recognize a state's interests in life are strong, such interests standing alone will usually not preclude a competent person from declining life-sustaining medical treatment. *Thor,* 855 P.2d at 384. The reason is

> because the life that the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequately protect itself.

*Id.*

■ It is also commonly understood that as the quality of life diminishes because of physical deterioration, a state's interest in preserving life correspondingly reduces. *Id.* As one court put it:

> The interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's in-

sistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether but when, for how long, and at what cost to the individual that life may be briefly extended. *Superintendent of Belchertown v. Saikewicz*, 373 Mass. 728, 741–42, 370 N.E.2d 417, 425–26 (1977) (patient's leukemia was incurable, treatment had painful side effects, and the disease would soon cause death regardless of any medical treatment).

Here, the State's interests in the preservation of life is implicated. While Brown's kidney disease is not curable, his condition is not terminal in the sense that he is going to die soon regardless of the treatment he receives. On the contrary, continued dialysis will permit Brown to live an otherwise normal and healthy life for perhaps twenty years. Thus, compelling Brown to submit to dialysis "does not involve a situation where 'heavy physical and emotional burdens' would be imposed 'to effect a brief and uncertain delay in the natural process of death.'" *Myers*, 399 N.E.2d at 456 (holding that State could compel prisoner to undergo lifesaving kidney dialysis treatments). We conclude therefore that in this instance the State's interest in the preservation of life weighs heavily in the balance.

But, as we have pointed out, this interest does not alone control Brown's right to refuse treatment. We must also factor into our balancing process the magnitude of the invasion brought about by dialysis. *See, e.g., Lane v. Candura*, 6 Mass.App.Ct. 377, 384, 376 N.E.2d 1232, 1236 (1978) (upholding right of a competent adult to refuse a leg amputation that would save, not merely prolong, her life; decisive factor in the balancing test was the magnitude of the proposed invasion). Although the dialysis procedure is not painful and produces no serious side effects, the procedure requires Brown's commitment, patience, and endurance three times a week for three and one-half hours for the rest of his life. As the court in *Myers* observed,

this is a "significant price" to pay "in return for saving" the life of the person refusing the treatment. *Myers*, 399 N.E.2d at 457. Yet, we think this factor militates in favor of compelling treatment.

**B.. Preventing suicide.** Closely related to the interest of preserving life is the State's interest in preventing suicide. There is a distinction

between a person suffering from a serious life-threatening disease or debilitating injury who rejects medical intervention that only prolongs but never cures the affliction and an individual who deliberately sets in motion a course of events aimed at his or her own demise and attempts to enlist the assistance of others.

*Thor*, 855 P.2d at 385. In the former case, we may presume the patient's motive is not to commit suicide; in the latter, the motive is clearly to commit suicide.

*In re Caulk* is a good illustration of a state's interest in preventing suicide. 125 N.H. 226, 480 A.2d 93 (1984). There, the prisoner went on a hunger strike because he *wanted* to die. He simply did not want to spend the rest of his life in prison. Rejecting the prisoner's contention that he was allowing himself to die rather than committing suicide, the court reasoned:

This is not a situation where an individual facing death from a terminal illness, chooses to avoid extraordinary and heroic measures to prolong his life, albeit for a short duration. Rather, the defendant has set the death-producing agent in motion with the specific intent of causing his own death. Thus, in these circumstances, the State's interest in preserving life and preventing suicide dominates.

*Id.* at 97 (citations omitted).

In oral argument, counsel for the sheriff conceded suicide is not implicated here because medical testimony indicated Brown would die from natural causes if he refused treatment. Brown agrees and cites *Myers* as authority. *See Myers*, 399

N.E.2d at 456 (holding that refusing dialysis is not a form of suicide because death would result from natural causes). We give no further consideration to this factor.

■ **C. Protecting the interests of innocent third parties.** This interest arises "when the refusal of medical treatment endangers the public health or implicates the emotional or financial welfare of the patient's minor child." *Singletary v. Costello,* 665 So.2d 1099, 1105 (Fla.Dist.Ct. App.1996). There is nothing about Brown's condition that endangers the public health. Brown concedes, however, that "the protection of the interests of innocent third parties does present a more troubling analysis."

The record reflects that Brown has children. There is no indication of the children's ages, but given Brown's age, we may assume they are minors. Sadly, Brown told Taylor that he had no particular concern about the potential impact his death would have upon his children. According to Taylor, Brown stated his own father "passed" when Brown was in his early twenties and that he "got over it and went on with his life." Although, as Brown argues, as a jail inmate he would be unable to provide financially for his dependents, we can still consider the emotional impact upon them. Additionally, we cannot presume that Brown would never be in a position to provide financial support to them. Although not controlling, we must still weigh this factor in the balance, and we do so in favor of compelling treatment.

**D. Maintaining the ethical integrity of the medical profession.** As one court points out, "[a]dvances in the medical science have given doctors greater control over the time and nature of death." *Superintendent of Belchertown,* 370 N.E.2d at 423. Before these advances, doctors believed their ethics required them to do everything conceivably possible to prolong life. *Id.* But doctors then did not have the options they have today to prolong life regardless of the effect on the patient. *Id.* So today, doctors face difficult questions as to what may constitute acting in the best interests of the patient." *Id.* One commentator has expressed the current medical ethics in these circumstances this way:

> [W]e should not use extraordinary means of prolonging life or its semblance when, after careful consideration, consultation and the application of the most well conceived therapy it becomes apparent that there is no hope for the recovery of the patient. Recovery should not be defined simply as the ability to remain alive; it should mean life without intolerable suffering.

*Id.* at 424 (quoting Lewis, *Machine, Medicine and Its Relation to the Fatally Ill,* 206 J.A.M.A. 387 (1968)).

The same considerations we gave respecting Brown's positive prognosis in our discussion of the preservation of life apply here. Assuming Brown would voluntarily submit to dialysis treatment, there is no doubt that health care practitioners would recommend such treatment. Medical testimony in this case was consistent with this recommendation. Preserving the ethical integrity of that recommendation also favors our decision to compel treatment.

**E. Maintaining prison security, order, and discipline.**

■ **1. Brown's status as a pretrial detainee.** Before addressing the final state countervailing interest, we consider what impact Brown's status as a pretrial detainee has on the issue. We start with the proposition that the state may constitutionally incarcerate a person charged with a crime but yet not convicted to ensure the person's presence at trial. *Bell v. Wolfish,* 441 U.S. 520, 531, 99 S.Ct. 1861, 1869, 60 L.Ed.2d 447, 463 (1979).

■ The presumption that a pretrial detainee is innocent "has no application to a determination of the rights of" such a person "during confinement before his trial has ever begun." *Id.* at 533, 99 S.Ct. at 1871, 60 L.Ed.2d at 464–65. But,

in accordance with the Due Process Clause of the Fourteenth Amendment, a pretrial detainee may not be punished before adjudication of guilt. *Id.* at 534, 99 S.Ct. at 1872, 60 L.Ed.2d at 465. This is because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Id.* at 536, 99 S.Ct. at 1872, 60 L.Ed.2d at 466 (citation omitted). Jail authorities may, however, subject such detainees to the restrictions and conditions of the detention facility as long as those restrictions and conditions do not amount to punishment or otherwise violate the Federal Constitution. *Id.* at 536–37, 99 S.Ct. at 1873, 60 L.Ed.2d at 466–67. One legitimate interest that jail authorities have to infringe upon the liberty of a pretrial detainee is to ensure the detainee's presence at trial. *Id.* at 540, 99 S.Ct. at 1874, 60 L.Ed.2d at 469.

■ Jail authorities also have "legitimate interests that stem from [their] need to manage the facility in which the individual is detained." *Id.* For example, they "must be able to take steps to maintain security and order" at the jail. *Id.* Restrictions and conditions reasonably related to these interests do not constitute punishment. *Id.* at 540, 99 S.Ct. at 1875, 60 L.Ed.2d at 469. This is so even though the detainee would not have experienced these restrictions and conditions had the detainee been released while awaiting trial. *Id.*

In determining whether these restrictions and conditions are reasonably related to the interest in maintaining security and order, the Supreme Court has said that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495, 504 (1974).

■ Several other general principles bear on the question whether jail restrictions and conditions violate a pretrial detainee's rights under the Due Process Clause of the Federal Constitution. Such persons retain at least those rights that convicted persons enjoy. *Bell,* 441 U.S. at 545, 99 S.Ct. at 1877, 60 L.Ed.2d at 472. Convicted persons "do not forfeit all constitutional protections." *Id.* For example, they retain freedom of speech and religion and "may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law." *Id.*

■ Such constitutional rights, however, are subject to restrictions and limitations justified by the considerations underlying the penal system. *Id.* at 545–46, 99 S.Ct. at 1877, 60 L.Ed.2d at 472–73. Confinement and the legitimate goals and policies of the penal institution limit these retained constitutional rights. *Id.* at 546, 99 S.Ct. at 1878, 60 L.Ed.2d at 473; *Risdal v. State,* 573 N.W.2d 261, 263 (Iowa 1998). Simply put, there must be a "'mutual accommodation between institutional needs and objectives and provisions of the Constitution that are of general application.'" *Bell,* 441 U.S. at 546, 99 S.Ct. at 1878, 60 L.Ed.2d at 473 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (1974)). These restrictions and limitations on constitutional rights apply "equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.*

■ Similar to the punishment issue, the proper standard for determining the constitutional validity of such restrictions and limitations is whether they are "reasonably related to legitimate penological interests." *Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108

L.Ed.2d 178, 199 (1990) (citation omitted); *accord Risdal*, 573 N.W.2d at 264. The standard applies even though "the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." *Washington*, 494 U.S. at 223, 110 S.Ct. at 1037, 108 L.Ed.2d at 199.

▮ Maintaining security and preserving internal order and discipline "are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878, 60 L.Ed.2d at 473. Thus, even when an institutional restriction infringes a specific constitutional guarantee, courts must evaluate the infringing restriction in the light of these goals. *Id.* at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 473.

▮ Because problems that arise in the day-to-day operation of a penal institution are not easy to solve, courts should accord administrators of such institutions "wide-ranging deference in the adoption of and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* Thus, similar to the punishment issue, these

> considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 548, 99 S.Ct. at 1879, 60 L.Ed.2d at 474 (citation omitted); *accord Risdal*, 573 N.W.2d at 264. This deference applies even in the case of pretrial detainees. *Bell*, 441 U.S. at 548 n. 29, 99 S.Ct. at 1879 n. 29, 60 L.Ed.2d at 505 n. 29.

▮ Additionally, correction officials may curtail constitutional rights whenever "in the exercise of their informed discretion, [they] conclude" that an inmate's conduct may likely disrupt "[the penal institution's] order or stability, or otherwise interfere with the legitimate penological objectives of the" institutional environment. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629, 642–43 (1977). Correction officials need not wait until the problem arises:

> Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. Responsible officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.

*Id.* at 132–33, 97 S.Ct. at 2541, 53 L.Ed.2d at 643.

**2. The merits on the issue of maintaining prison security, order, and discipline.** Given the broad discretion accorded correctional authorities, we can easily say there is a reasonable relationship between the jail's restriction on Brown's claimed liberty interest to refuse treatment and the jail's overwhelming interest in maintaining jail security, order, and discipline. We cannot take lightly the chief jailer's concerns that other inmates would "copycat" Brown's actions as an excuse to get out of jail. The chief jailer, of course, need not wait until that happens. He can take reasonable steps to prevent such actions from ever occurring. And we fail to see any substantial evidence from which we can conclude the chief jailer's application to the district court was an exaggerated response to Brown's refusal. Given the chief jailer's twenty-three years of experience at the jail, we should not second-guess his judgment call. Rather, we should defer to that judgment.

Other courts have used the same rationale when inmates have gone on hunger strikes. In most of these cases, the inmate's main aim was to gain attention from correction officials and sometimes

from the public to manipulate the penal system. In virtually all of these cases, the court allowed force-feeding as a reasonable response to a threatening disruption of discipline and order in the penal institution. The common fear was that other inmates might do the same thing for manipulative purposes. *See, e.g., Kallinger*, 580 A.2d at 891 (holding that correction officials could force-feed inmate on hunger strike who was attempting to manipulate the penal system; testimony indicated that his actions might prompt other inmates to "copycat" his actions); *see also Myers*, 399 N.E.2d at 457 (holding that correction officials could force kidney dialysis treatment on inmate refusing such treatment as a form of protest against his placement in a medium, as opposed to minimum, security prison; correction officials argued on appeal that State's failure to prevent inmate's death would present a serious threat to prison order and security by encouraging other inmates to attempt similar forms of coercion to gain illegitimate ends).

It is true Brown made no demands on the sheriff in return for Brown's accepting dialysis treatment. We can, however, reasonably infer this manipulative motive from Brown's statement to Taylor that spending any further time in any correctional facility was unacceptable and that he was going to stop his dialysis treatment. In that same discussion, Brown stated he was going to stop his dialysis treatment until March 4, the date of his pretrial conference. The fair implication from this statement is that by then Brown's condition might be serious enough to convince authorities to let him out of jail.

There was also evidence that Brown's refusal of medical treatment would disrupt day-to-day management of the jail. The chief jailer testified that Brown's refusal of medical treatment would require more staff supervision for Brown than for other inmates suffering, for example, from a contagious disease or mental illness. The staff would have to watch Brown closely

for signs that he was going into cardiac arrest so they could rush him to the hospital. To the chief jailer, this was in his language, a "big, big" concern in light of his duty to provide medical care to every inmate. This is the kind of day-to-day jail management problem that demands we give deference to the chief jailer's response to solve that problem.

For all of these reasons, we find that compelling Brown to accept dialysis treatment is reasonably related to legitimate penological interests.

## VII. Conclusion.

█ In balancing Brown's diminished liberty interest to refuse treatment against the State's countervailing interests in preserving life, preventing suicide, protecting the interests of innocent third parties, maintaining the ethical integrity in the medical profession, and maintaining prison security, order, and discipline, we conclude the State's interests must prevail. We therefore have no choice but to sustain the writ.

**WRIT SUSTAINED.**

All justices concur except SNELL and CADY, JJ., and McGIVERIN, C.J., who dissent, and TERNUS, J., who takes no part.

SNELL, Justice. (dissenting).

I respectfully dissent. I join Justice Cady's dissent with these additional comments. The majority's application of the legal principles that are appropriate to this issue seriously diminishes, if not eliminates, to a pretrial detainee the liberty interest established by the United States Constitution. Under the majority's analysis, it would be extremely unlikely that any exercise of the liberty interest to refuse unwanted medical treatment would be upheld over a jailer's objection. This is because a jailer could always conjure up a fear that a prisoner's act of exercising his constitutional liberty interest would have a "fallout" effect on other prisoners. This

possible fallout effect allegedly would then cause serious adverse consequences to the jail's security, order and discipline requirements. As viewed by the majority, that possibility is enough to tip the scales under the balancing test and necessitate a jettisoning of the liberty interest of the United States Constitution. A possibility of fallout is all that the sheriff puts forth as evidence. Beyond that, there is no foundational support in fact for the premise that prison security, order and discipline would be seriously affected adversely if Brown were allowed to exercise his constitutional right.

The liberty interest guaranteed by the United States Constitution is found in the Fourteenth Amendment that provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment has been firmly established by the United States Supreme Court. *See Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224, 241 (1990). Such a principle has been inferred in the Court's earlier decisions. As early as 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of any individual to the possession and control of his person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific R.R. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891).

This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an opera-

tion without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129–130, 105 N.E. 92, 93 (1914) [*overruled in part on other grounds by Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957)]. The informed consent doctrine has become firmly entrenched in American tort law. *See* Keeton, Dobbs, Keeton, & Owen, *supra,* § 32, pp. 189–192; F. Rozovsky, Consent to Treatment, A Practical Guide 1–98 (2d ed.1990).

The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment. *Cruzan,* 497 U.S. at 269–70, 110 S.Ct. at 2846–47, 111 L.Ed.2d at 236.

The Supreme Court has also held that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178, 197–98 (1990). Even children have a substantial liberty interest in not being confined unnecessarily for medical treatment. *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101, 117 (1979).

As a pretrial detainee, Brown is confined, both at the jail and at the hospital, where he is forced to receive unwanted medical treatment. The additional form of confinement inherent in the imposition of unwanted medical treatment was addressed by Justice O'Connor in stating:

The State's imposition of medical treatment on an unwilling competent adult necessarily involves some form of restraint and intrusion. A seriously ill or dying patient whose wishes are not honored may feel a captive of the machinery required for life-sustaining measures or other medical interventions. Such forced treatment may burden that individual's liberty interest as much as any state coercion.

*Cruzan,* 497 U.S. at 288, 110 S.Ct. at 2856, 111 L.Ed.2d at 248 (O'Connor, J., concurring).

In upholding this liberty interest, the Supreme Court has recognized that it is derived from a long history. It has been protected as a constitutional right, a common law right to privacy, a common law right to informed consent and the right to self-determination. *See id.* at 269–73, 110 S.Ct. at 2846–48, 111 L.Ed.2d at 236–38.

Regarding the conflict between individual constitutional rights and the interests of the state, the Supreme Court quoted with approval language from the New Jersey Supreme Court. It said:

On balance, the right to self-determination ordinarily outweighs any counterprevailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death. Most of the cases that have held otherwise, unless they involved the interest in protecting innocent third parties, have concerned the patient's competency to make a rational and considered choice.

*Id.* at 273, 110 S.Ct. at 2848, 111 L.Ed.2d at 238 (quoting *In re Conroy,* 98 N.J. 321, 486 A.2d 1209, 1225 (1985)).

In the case at bar, there is no question that Brown is competent to make a rational and considered choice.

In *Bell v. Wolfish,* the Supreme Court examined the constitutional rights of pretrial detainees—those persons who have been charged with a crime but who have not yet been tried on the charge. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447, 472 (1979). The Court noted that it had previously held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. *See Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629, 640 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935, 950–52 (1974). They may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law. *See, e.g., Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 459 (1976); *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2974, 41 L.Ed.2d at 951.

The Supreme Court further stated:

A fortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.

*Bell,* 441 U.S. at 545, 99 S.Ct. at 1877, 60 L.Ed.2d at 472; *see also Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir.1998) (pretrial detainees entitled to at least as much protection as a convicted inmate).

Brown has not been convicted of any crime; he is detained and incarcerated to ensure his appearance for trial solely on the legal principle that there is reasonable cause to believe he has committed a crime. *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 65 (1975). Although the presumption of innocence does not attach until trial, he is then entitled to it under the Constitution as a free person. *Bell,* 441 U.S. at 520, 99 S.Ct. at 1861, 60 L.Ed.2d at 447; *see In re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970).

Prisoners possess a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment. *Washington,* 494 U.S. at 221–22, 110 S.Ct. at 1036, 108 L.Ed.2d at 197–98.

Although the evidence suggests that physical pain is minimal in kidney dialysis treatment it can hardly be said, under these circumstances of unwanted treatment by Brown, that mental and emotional pain is not present. And, given that likelihood, has Brown been the recipient of punishment by the state, in furthering its own interests?

"Punishment" has been defined to include pain, suffering or confinement.

> **PUNISHMENT.** In criminal law. Any pain, penalty, suffering, or confinement inflicted upon a person by the authority of the law and the judgment and sentence of a court, for some crime or offense committed by him, or for his omission of a duty enjoined by law.

Black's Law Dictionary 1398 (4th ed.1951).

The Supreme Court in *Bell* considered a series of restrictions imposed on pretrial detainees, who were housed with convicted felons, in determining their liberty interests under the Fourteenth Amendment. These regulations by the jail officials included double bunking; restrictions on receipt by mail of food, personal items and books; and submission to strip searches, room searches, and body cavity searches. These measures were all found to be rationally related to the legitimate security concerns of the jail officials. As such, they did not constitute punishment of pretrial detainees that deprived them of their liberty interest without due process of law under the Constitution.

The same cannot be said of the State's decision imposed upon Brown. Though establishing legal maxims, the *Bell* case is inapposite to Brown's situation. The security problems addressed in *Bell* came from parties outside the jail who directed their actions to the pretrial detainees in jail. Brown's desire to exercise his liberty right is passive, independent, and inherently nonthreatening. Contrasted to the physical restrictions addressed in *Bell,* the imposition of the State's interests on Brown's liberty interest is vastly more invasive. Brown has been denied the very essence of self-determination. He has been the recipient of punishment by the State including the physical pain of unwanted medical treatment and the mental and emotional pain underlying a decision of this magnitude.

In the instant case, the majority has fundamentally undervalued the liberty interest of the Fourteenth Amendment. At the same time it has recognized the State's interests as supreme even though they are totally unsupported by the evidence. Regarding the state's interest in preserving life, the Supreme Court quoted with approval the New York Court of Appeals' statement that " 'no person or court should substitute its judgment as to what would be an acceptable quality of life for another.' " *Cruzan,* 497 U.S. at 275, 110 S.Ct. at 2849, 111 L.Ed.2d at 239 (quoting *In re Westchester County Med. Ctr. ex rel. O'Connor,* 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607, 613 (1988)).

As to the interests of innocent third parties, there is no evidence on this matter. With respect to maintaining the integrity of the medical profession there is no evidence to indicate any effect. Finally, on the issue of maintaining prison security, order and discipline, the record is devoid of any evidence of danger or impediment to these concerns emanating from Brown's expressed decision to exercise his constitutionally protected liberty interest. The majority's belief that this is a weighty factor is supported not by facts or citable incidents of problems created by Brown, but only by the chief jailer's concern about some residual effect causing "some fallout with some other inmates." A never explained piece of nebulous evidence, at best.

Constitutional rights should not be shunted aside by such a frail reed of supposition.

I believe that the trial court carefully analyzed the law, properly assessed the factual circumstances presented and correctly decided this case. I would annul the writ of certiorari.

McGIVERIN, C.J., and CADY, JJ., join this dissent.

CADY, Justice. (dissenting).

I respectfully dissent. I agree with the legal principles set forth in the majority opinion, but disagree with the application of these principles to the facts of the case.

The State has failed to show Brown's constitutional right to refuse unwanted medical treatment must be taken from him to protect the security, order, and discipline of the jail.

A competent person has a constitutional right to refuse unwanted medical treatment. *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224, 241 (1990). Consequently, our government may not deprive an individual of this right without establishing an overriding state interest. *See Winegard v. Oxberger,* 258 N.W.2d 847, 850 (Iowa 1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978). The majority has identified five state interests implicated by Brown's exercise of his constitutional right, and concluded these interests outweigh the exercise of his right.

In considering the State's interest, it must be recognized that Brown's constitutional right to refuse unwanted medical treatment would, most assuredly, prevail over the competing interests of the State if he were not incarcerated in the county jail. This is because most of the interests of government identified by the majority have been considered, directly or indirectly, in recognizing the existence of the underlying constitutional right to refuse medical treatment. *See Cruzan,* 497 U.S. at 271, 110 S.Ct. at 2847–48, 111 L.Ed.2d at 237. Consequently, this is not a case of protecting life, preventing suicide, protecting innocent third parties, or maintaining the ethical integrity of the medical profession. These interests must generally give way to the individual right to refuse medical treatment. *Id.* at 278, 110 S.Ct. at 2851, 111 L.Ed.2d at 241.

Instead, what really drives this case is the State's interests in maintaining jail security, order, and discipline. While these are legitimate interests, I do not believe the State showed they would be sufficiently compromised to support the denial of a recognized constitutional right.

A prison regulation which impinges on a constitutional right of a prisoner is valid if the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79 (1987). Although this is not a stringent test, it nevertheless requires a reasonable connection between the regulation imposed by the prison and the penological interest at stake. *Id.* at 93, 107 S.Ct. at 2264, 96 L.Ed.2d at 82. Regulations based on "exaggerated" concerns are not reasonably related to any state interest. *Id.* at 97–98, 107 S.Ct. at 2266, 96 L.Ed.2d at 84. The mere possibility of an adverse impact upon a governmental interest is insufficient to subordinate a constitutional right. *See Turley v. Adel Community Sch. Dist.,* 322 F.Supp. 402, 408 (S.D.Iowa 1971). Constitutional rights are too important to be denied based on supposition and unfounded fears.

The State offered two penological interests to support its mandate that Brown receive dialysis. First, it claimed other inmates would attempt to follow Brown's actions as a way to be released from jail. Second, it claimed more staff would be needed to supervise Brown once his physical condition began to deteriorate. Giving deference to the jailer's expertise and experience, the majority concludes these interests support the denial of Brown's constitutional right.

Although manipulative behavior and supervision are legitimate general penological concerns, they are not in this case. We should not accept the expressed concerns of the State without subjecting them to some scrutiny that reveals a reasonable necessity for the particular regulation.

The first claim is an exaggerated response by the jailer. There is no suggestion that authorities would release Brown from his pretrial detention if his decision to refuse medical treatment was honored. To the contrary, the evidence indicated Brown would simply be transported to a hospital once his medical condition became critical. Not only would any manipulative

motive be unsuccessful, but the planned response by the jailer would not give other inmates an incentive to copy Brown. This is not a case of an inmate attempting to manipulate the system to obtain some advantage. Brown simply wants to die by discontinuing his medical treatment. He would not be engaging in conduct others would be inclined to follow.

The second concern is also exaggerated in this case. Although Brown may require some additional supervision for a limited period of time if he discontinued his dialysis, it is unrealistic to claim this minimal imposition on prison staff would undermine prison security, order, or discipline any more than the current supervision Brown receives.

Prisoners are not divested of their constitutional rights once they become imprisoned. *Williams v. State,* 378 N.W.2d 894, 897 (Iowa 1985). Brown has a recognized constitutional right to refuse unwanted medical treatment. *Cruzan,* 497 U.S. at 278, 110 S.Ct. at 2851, 111 L.Ed.2d at 241. Without a compelling and overriding interest, our government should not deprive citizens of their constitutional rights. Constitutional rights must not become so confined by government restrictions that they begin to exist in principle more than fact. *See Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 508–09, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 739 (1969).

McGIVERIN, C.J., and SNELL, JJ., join this dissent.