# IN THE COURT OF APPEALS OF IOWA

No. 14-0256
Filed April 22, 2015

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**KENT ANTHONY TYLER III,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.


　　　　Kent Tyler appeals from his conviction and sentence for murder in the second degree. **CONVICTION AND SENTENCE REVERSED AND REMANDED.**


　　　　Angela Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant.

　　　　Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, John P. Sarcone, County Attorney, and Daniel Voogt and Stephanie Cox, Assistant County Attorneys, for appellee.


　　　　Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, J.**

Kent Tyler III appeals his conviction and sentence for murder in the second degree, in violation of Iowa Code section 707.3 (2013).[1] Tyler claims the State failed to present sufficient evidence of his guilt under each of the three legal theories submitted to the jury. He also claims the district court abused its discretion by allowing irrelevant and unduly prejudicial prior bad acts evidence to be admitted at trial. Lastly, he claims the district court erred by instructing the jury on theories of joint criminal conduct and aiding and abetting.

We find there is not sufficient evidence to support the conviction on any of the three theories submitted. We therefore reverse the conviction but do not address Tyler's evidentiary claim or jury-instruction claim.

### I. Factual and Procedural Background.

On October 8, 2013, Tyler, James Shorter, Yarvon Russell, and LePrese Williams were jointly charged by trial information with murder in the first degree. The charges resulted from events that occurred on August 24, 2013. Because Tyler did not waive his right to speedy trial and eventually sought severance from the other three defendants, he was tried separately. His trial commenced on December 9, 2013.

At trial, testimony established that on the night of August 24, 2013, Tyler and other individuals were at a party in a parking lot near the Des Moines River. Witnesses estimated anywhere from twenty to seventy teenagers or young

---

[1] "A person who kills another person with malice aforethought either express or implied commits murder." Iowa Code § 707.1. "A person commits murder in the second degree when the person commits murder which is not murder in the first degree." Iowa Code § 707.3(1).

individuals were present at the party.  Isiah Berry and his girlfriend, Monica Perkins, had been fishing that day and were in the parking lot when people began to gather.  They were still there later in the evening when Richard Daughenbaugh drove into the parking lot.  He attempted to park his truck, but some individuals were standing in the parking spot.  Daughenbaugh honked his truck horn, exchanged words with a male, Derico Lowery, who continued to stand in the spot, and then Daughenbaugh parked.  After exiting his truck, Daughenbaugh began mingling and dancing with the crowd in the parking lot.  He was seen drinking from a bottle of alcohol that was being passed around.  Later toxicology reports also revealed that Daughenbaugh had used methamphetamine that day.[2]

Perkins testified that approximately fifteen or twenty minutes after Daughenbaugh arrived, she saw a man hit Daughenbaugh in the face.  Daughenbaugh fell to the ground.  When he tried to get up, a group of people began stomping on Daughenbaugh.  Perkins ran over and placed herself over Daughenbaugh on the ground.  Berry ran over to help her, and several of the people stopped stomping on Daughenbaugh to chase Berry away.  At one point, Berry tripped and fell and people started attacking him while he was on the ground.  Perkins then used her cell phone to call 911.  As she was talking to the dispatcher, a couple of girls from the crowd took Perkins's cell phone from her and threw it toward the river.  Police arrived as the crowd dispersed.

---

[2] The toxicology report showed Daughenbaugh's blood alcohol level was .186 and methamephamine level was 73 nanograms per milliliter.

Daughenbaugh was pronounced dead at 1:57 a.m. on August 25, 2013. The medical examiner, Dr. Gregory Schmunck, testified that Daughenbaugh had external injuries to his face consistent with blunt force trauma, but Daughenbaugh had not sustained any significant internal injury to the head. Rather, Dr. Schmunck concluded the cause of death was multiple blunt force traumas to the mesentery. Specifically, he explained that Daughenbaugh had two liters of blood in his abdominal cavity at the time of the autopsy. Dr. Schmunck testified, "I feel that these injuries from a forensic standpoint indicate that the victim, the decedent, was probably unable to defend himself at the time the blows were rendered to the abdomen."

Raymond Shorter was one of the teenagers at the party. He testified he heard "Buddha" tell Daughenbaugh not to touch him and then saw him knock Daughenbaugh to the ground. Tiarra Talbert was also at the party on the night in question; she testified she did not witness who hit Daughenbaugh, but she testified that Kent Tyler is also known as Buddha. Elissa Roland testified she saw Daughenbaugh touch Tyler's arm and then saw Tyler hit Daughenbaugh in the face. Latayah Shumpert, another party-goer, testified she witnessed the first punch, stating the assailant "hit [Daughenbaugh] and then he walked off." At trial, Lowery testified he could not remember much from the night in question; however, the State introduced impeachment evidence that Lowery had previously told the police that Tyler went by the nickname Buddha and that Tyler hit Daughenbaugh.

Breanna Billings was also at the party on the night in question. Tyler objected to Billings's testimony insofar as she was expected to testify that he

participated in other, previous fights with the codefendants. The State made an offer of proof of Billings's testimony outside the presence of the jury.[3]

During the offer of proof, Billings testified that once she saw the crowd—including Russell, Shorter, Williams, and Tyler—surround Daughenbaugh, she wanted to leave. When asked why, she stated, "Usually fights happen." She further testified she had previously witnessed Shorter and Russell fight together and Tyler and Williams fight together, but she had not seen the four of them fight someone before. When questioned by the defense, the following exchange occurred:

> Q: And so you were asked [by the police] if you had ever seen [Tyler] in a fight before? A: Yeah.
> Q: What did you say? A: No.
> Q: What about [Williams]? You were asked if you had ever seen [Williams] fight? A: I said no.
> Q: So you have seen them fight before? A: Yeah.
> Q: Okay. So what you said on page 52 was not true? A: Right.
> Q: Okay. So let's talk about when you saw [Tyler] fight. A: Like maybe towards the beginning of the year.
> Q: Okay. A: I think.
> Q: Can you give me a month? A: Probably like April or May. It was in the summer. Actually it was in the summer.
> Q: Pardon me? A: It was in the summer.
> Q: And [Williams] was there? A: Yeah, I think.
> Q: Tell me about it. A: There was a party, a big group of people, and they fought, multiple people.
> Q: And that was again just [Williams] and [Tyler]? [Russell] and [Shorter] were not there? A: No.
> Q: And you would agree with me, Ms. Billings, that you told the police that you had seen neither [Tyler] nor [Williams] in a fight before? A: Yeah.

---

[3] The State made the offer of proof in order for the district court to determine whether the evidence was admissible. Because the court found that the evidence was relevant to Tyler's knowledge and intent on the night in question and that the evidence was substantially more probative than prejudicial, the court overruled the objection.

The court held Billings's testimony was admissible to prove Tyler's knowledge and intent.

In front of the jury, Billings testified that on the night in question, she saw Tyler, Williams, Shorter and Russell surround Daughenbaugh and she wanted to leave. When asked why, over the defense's objection, Billings testified, "I seen it all before. I just want to get out of there. I know what they're capable of." She clarified that she meant fighting. She then clarified that she saw the crowd surround Daughenbaugh before the first punch was thrown or any fighting began. She testified, "I seen the crowd surround him. I was ready to go. I know what's going to happen, and I don't want to be a part of it. So that when we get in the car and we leave when the group is forming."

Over Tyler's objection, the case was submitted to the jury under the theories of individual liability, aiding and abetting, and joint criminal conduct. The court instructed the jury they were not required to unanimously agree on the theory. The jury returned a general verdict finding Tyler not guilty of murder in the first degree, but guilty of murder in the second degree. On February 19, 2014, Tyler was sentenced to a mandatory term of incarceration not to exceed fifty years. He appeals.

**II. Standard of Review.**

We review sufficiency of evidence claims for the correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). The court must consider all of the record evidence in a light most favorable to the State including reasonable inferences from the evidence. *Id.* The verdict must be upheld if there is substantial evidence to support it. *Id.* "Evidence is considered substantial if,

when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* "All evidence is considered, not just that of an inculpatory nature." *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury is free to reject certain evidence, and credit other evidence." *Sanford*, 814 N.W.2d at 615.

**III. Discussion.**

Tyler claims the State failed to present sufficient evidence of his guilt under any of the three legal theories submitted to the jury: (1) individual liability, (2) aiding and abetting, and (3) joint criminal conduct.[4]

### A. Individual Liability

In order to convict Tyler of murder in the second degree under the theory of individual liability, the State was required to prove that Tyler, without justification (1) assaulted Daughenbaugh; (2) Daughenbaugh died as a result of the assault; and (3) Tyler acted with malice aforethought. Tyler maintains that there is not sufficient evidence to support his conviction under a theory of individual liability, because even if the testimony at trial established that he threw the first punch, his actions were neither the but-for nor independently-sufficient cause of Daughenbaugh's death.

---

[4] Tyler argues his conviction must be reversed if any *one* of the theories of liability is not supported by substantial evidence. The State, citing *Griffin v. United States*, 502 U.S. 46 (1991), argues his conviction must be affirmed unless *all* theories of liability are not supported by substantial evidence. *See also State v. Thorndike*, No. 13-1403, 2014 WL 3931873, at *3–4 (Iowa Ct. App. Aug. 13, 2014). Because we find none of the three theories in this case is supported by substantial evidence, we do not address this issue.

"Generally, causation exists in criminal law, often without much fanfare, as a doctrine justifying the imposition of criminal responsibility by requiring a 'sufficient causal relationship between the defendant's conduct and the proscribed harm.'" *State v. Tribble*, 790 N.W.2d 121, 126 (Iowa 2010) (quoting *State v. Marti*, 290 N.W.2d 570, 584 (Iowa 1980)). "The conduct of a defendant is a 'factual cause of harm when the harm would not have occurred absent the conduct.'" *Id.* (quoting Restatement (Third) of Torts: *Liability for Physical and Emotional Harm* § 26, at 346 (2010)). The definition of proximate cause in a criminal case is the same as in a civil case. *State v. Wissing*, 528 N.W.2d 561, 564 (Iowa 1995). "In the criminal context, proximate cause serves as a requirement that there be a sufficient causal relationship between the defendant's conduct and a proscribed harm to hold him criminally responsible." *Id.* (internal quotation marks omitted).

The State maintains there was substantial evidence to support a jury finding that Daughenbaugh would have been able to protect himself from the blows that caused his death but for Tyler's initial punch. Dr. Schmunk testified that it was the injury to Daughenbaugh's mesentery that caused his death. He testified that such an injury to the mesentery is unusual in adults of Daughenbaugh's size because "normally an adult male, unlike a child, can protect themselves from blows to the abdomen." When asked specifically whether Daughenbaugh's injuries were consistent with his being unable to defend himself, Dr. Schmunck testified, "I feel that these injuries from a forensic standpoint indicate that the victim, the decedent, was probably unable to defend himself at the time the blows were rendered to the abdomen."

Perkins and Roland testified that Daughenbaugh fell to the ground after he was hit in the face. They further testified that Daughenbaugh tried to get up from the ground. However, when the crowd began to kick him and stomp on him, Daughenbaugh was unable to stand up. The State argues these facts are sufficient to support the jury's verdict Tyler is guilty of murder in the second degree.

However, we do not believe there is a "sufficient causal relationship between the defendant's conduct and a proscribed harm to hold him criminally responsible" on an individual liability basis. *Id.* None of the witnesses testified that Tyler took any part in the stomping and kicking of Daughenbaugh while he was on the ground. In fact, multiple witnesses testified that Tyler walked away after hitting Daughenbaugh once in the head or face. Dr. Schmunk testified that Daughenbaugh did not sustain any significant internal injuries to his head.

Testimony that Daughenbaugh may have been unable to defend himself from the blows that caused his death does not give rise to a reasonable inference that Tyler's punch was the cause of Daughenbaugh's purported inability to fend off his attackers. Testimony that Daughenbaugh attempted to rise after the initial punch indicates the punch did not incapacitate him. Thus, there is not substantial evidence to support a finding that Tyler was individually liable for murder in the second degree beyond a reasonable doubt.

B. Aiding and Abetting

In order to convict Tyler under the theory of aiding and abetting, the State was required to prove that Tyler, without justification, (1) either actively participated in assaulting Daughenbaugh or knowingly advised and encouraged

another to assault Daughenbaugh; (2) Daughenbaugh died as a result of the assault; and (3) Tyler acted with malice aforethought in aiding and abetting the perpetrators. "Mere nearness to, or presence at, the scene of the crime, without more evidence, is not aiding and abetting." *State v. Allen*, 633 N.W.2d 752, 754 (Iowa 2001). Mere knowledge of the crime is not enough to prove aiding and abetting. *Id.*

We find there is insufficient evidence for a rational jury to find beyond a reasonable doubt that Tyler "associate[d] himself with the venture [of Daughenbaugh's murder], that he participated in it as something that he wished to bring about, [or] that he sought by his action to make it succeed." *State v. Galvan*, 297 N.W.2d 344, 349 (Iowa 1980) (citation and internal quotation marks omitted). No evidence was presented that Tyler participated in the delivery of the blows that led to Daughenbaugh's death, nor was evidence presented that he advised or encouraged anyone to assault Daughenbaugh.

The State's evidence shows that Tyler was present at the scene. It also indicates that Tyler threw only one non-lethal punch. We do not agree with the State that this evidence gives rise to an inference that Tyler "knew that the others in the group would continue to assault Daughenbaugh as soon as a punch was thrown." Further, such knowledge would not itself satisfy the requirement that Tyler actively advised or encouraged a second assault. The State argues prior-bad-acts evidence of a previous fight in which Tyler and Williams were involved shows Tyler's knowledge and intent; however, that evidence shows only Tyler's knowledge that others might join in a fight or his intent to cause a fight to take place. The jury acquitted Tyler of murder in the first degree indicating a lack of

proof of specific intent to kill. There is a similar lack of proof of malice aforethought to support a conviction for murder in the second degree.

Tyler's single punch is not sufficient to give rise to a reasonable inference that he wished others to subsequently initiate a deadly assault, that he acted in any way to achieve such a result, or that he acted with malice aforethought. The State has failed to satisfy its burden to prove beyond a reasonable doubt that Tyler knowingly advised or encouraged anyone to initiate a deadly assault on Daugenbaugh. There is not substantial evidence to support Tyler's conviction under an aiding and abetting theory of the crime.

### C. Joint Criminal Conduct

To convict Tyler under the theory of joint criminal conduct, the State had to prove (1) Tyler acted together with at least one person; (2) Tyler knowingly participated in the crime of assault; (3) while furthering the crime of assault, another person or persons committed the different crime of murder; and (4) Tyler could have reasonably expected that the different crime of murder would be committed in furtherance of Tyler's assault. *See State v. Smith*, 739 N.W.2d 289, 294 (Iowa 2007); *see also* Iowa Code § 703.2. "Joint criminal conduct . . . contemplates *two* acts—the crime the joint actor has knowingly participated in, and a second or resulting crime that is unplanned but could reasonably be expected to occur in furtherance of the first one." *State v. Satern*, 516 N.W.2d 839, 843 (Iowa 1994).

The evidence presented at trial fails to establish that Tyler could have reasonably expected the crowd to murder Daughenbaugh as a result of his single punch. While there was testimony that Tyler and his friends had participated in a

fight in the past, there was no evidence that anything as serious as death had ever resulted. Billings's testimony taken in context demonstrates only that some of the people present during the assault were "capable of" starting fights, but it is not evidence that those same people would reasonably have been expected to commit murder.

To support its assertion Tyler should reasonably have expected Daughenbaugh's death, the State relies on an unpublished decision from this court, *State v. Gardner*, No. 02-1082, 2003 WL 21464629, at *2 (Iowa Ct. App. June 25, 2003), in which we held serious injury to be a foreseeable consequence of a large-scale, pre-planned fight between two large groups. *Gardner* aptly demonstrates the difference between a reasonably foreseeable outcome and one that is not reasonably foreseeable. In *Gardner*, nineteen individuals accosted a large group of party-goers for the purpose of initiating a fight. *Gardner*, No. 2003 WL 21464629, at *1. Due to the large number of people who planned together in advance to assault another large group of people, serious injuries were reasonably foreseeable. *Id.* at *2. In this case, on the other hand, there is no evidence Tyler's initial assault on Daughenbaugh was planned. Additionally, the ultimate injury was the victim's death, a consequence not contemplated or discussed in *Gardner* or in the evidence presented against Tyler.

The evidence does not establish that Tyler would reasonably expect his punch, or even a subsequent hypothetical fight, would lead to Daghenbaugh's death. Without proof of a reasonable expectation of a resulting murder, there is not substantial evidence to support Tyler's conviction under the joint criminal conduct theory of the crime.

**IV. Conclusion.**

We find insufficient evidence to support Tyler's conviction based on any of the State's three asserted theories of liability. Because at least one element of each of the three theories lacks substantial evidence to support it, we reverse Tyler's conviction and remand for entry of judgment of acquittal.

**CONVICTION AND SENTENCE REVERSED AND REMANDED.**

Bower, J., concurs; Danilson, C.J., concurs in part and dissents in part.

**DANILSON, C.J.** (concurring in part and dissenting in part)

I concur in part and dissent in part. I agree that Tyler may not be criminally liable on an individual basis, but I would affirm the conviction upon the theories of aiding and abetting and joint criminal conduct.

This case has enough issues to fill a criminal law hornbook as well as one evidentiary issue.

The majority did not address the issue of prior bad acts evidence. In respect to the prior bad acts evidence testified to by Billings—that Tyler and at least one of the codefendants had fought together at parties before—the district court stated:

> The witness who was present observing all of this knew based on her prior experience with this defendant and his brother, Leprese, just that same summer at a similar party under similar circumstances that there was going to be a fight based on what she was observing. That is very strong evidence, it seems to me, that the defendant himself knew or could reasonably expect that by confronting this person who turned out to be the victim and allegedly, at least at this point, striking the first blow that a fight was going to follow. A person intends the natural consequence of their act.

I agree. Further, the testimony regarding her prior knowledge of fighting was duplicative of Tyler's statement that fights always happen. The prejudicial effect does not substantially outweigh its probative value, and there was clear proof he committed the prior bad acts from his own admission to law enforcement. *See State v. Putman*, 848 N.W.2d 1, 9–10 (Iowa 2014) (holding that to be admissible, evidence of prior bad acts must be (1) relevant to a legitimate, disputed factual issue, such as identity, intent, or motive; (2) supported by clear proof the individual against whom the evidence is offered committed the bad act or crime;

and (3) be substantially more probative then prejudicial.); *see also* Iowa R. Evid. 5.401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

I concur with the majority's opinion that Tyler's conviction cannot be upheld on an individual basis. The marshalling instruction for second-degree murder simply provided that the jury must find Tyler assaulted Daughenbaugh with malice aforethought and as a result of the assault, Daughenbaugh died. The instruction did not permit the jury to conclude Tyler was guilty of second-degree murder on the basis of setting "in motion a force or chain of events" that "caused or resulted in the death" of Daughenbaugh, as the jury instruction for attempted murder did. Because Tyler's assault alone did not cause Daughenbaugh's death, his conviction may not upheld unless he is responsible on the theory of aiding and abetting or joint criminal conduct.

In respect to the theories of aiding and abetting and joint criminal conduct, I view the evidence differently than the majority. As testified by the medical expert, Daughenbaugh died as the result of an injury more typically seen in child abuse cases because children cannot protect themselves from such internal injuries. Here, the expert testified, in essence, that "but for" Tyler's assault causing Daughenbaugh to be knocked down and unconscious or nearly so, an adult such as Daughenbaugh would have been able to protect himself from the internal injuries causing his death. This expert testimony was undisputed. From this evidence, the district court concluded there was substantial evidence Tyler's

assault was a substantial factor in a chain of events that culminated in Daughenbaugh's death.

The majority states there was no evidence Tyler knew or reasonably could know the others would assault Daughenbaugh after his blow. Yet Tyler knew fights always happen. Further, Billings testified she could see what was going to occur and, as a result, immediately began leaving the party. If a bystander had such knowledge, it is reasonable to conclude Tyler also fully understood what would transpire. After all, he had members of the crowd circling around him as his confederates before he struck Daughenbaugh. All that was required to incite or encourage the crowd was the first blow—much like a call to the cavalry to "charge." In fact, stepping aside while others began to assault Daughenbaugh without any effort by Tyler to discourage or stop the vicious attack may also have encouraged the onslaught. Tyler's first blow also aided the confederates in putting Daughenbaugh in a compromised condition, and it may be said that Tyler "associate[d] himself with the venture, that he participated in it as something he wished to bring about, that he sought by his own action to make it succeed." *See State v. Galvan*, 297 N.W.2d 344, 349 (Iowa 1980). There was substantial evidence that Tyler should be held criminally responsible on the basis of the aiding and abetting theory.

Moreover, although Tyler may have walked away after landing the first blow, he never sought a jury instruction on the defense of abandonment or renunciation. He also argues he should not be responsible for the crowd's assaultive conduct after his blow to Daughenbaugh, but he never sought a jury instruction to be relieved of responsibility based upon a superseding intervening

act. Acts caused by third parties are intervening acts but unless the act is a superseding intervening act, the first party is not relieved of responsibility.[5] *State v. Fox*, 810 N.W.2d 888, 892 (Iowa 2011). In short, the majority has concluded Tyler's act was a de minimis act notwithstanding undisputed medical evidence to the contrary.

The jury was also instructed on the theory of joint criminal conduct. The only real issue regarding this theory is the requirement that Tyler "could have reasonably expected the different crime of murder would be committed in furtherance of the crime of assault." This instruction is aided by two other instructions that informed the jury they "may but are not required to, conclude a person intends the natural results of his acts" and "a person participates in a crime beginning with the first act done toward the commission of the crime and ending when a person has been arrested or has escaped from pursuers."[6] Tyler expected fights—he told law enforcement "it happens all the time." The natural consequence of assaultive conduct is injury and sometimes death. Other bystanders fearing for the safety of Daughenbaugh attempted to intervene— including one who jumped on top of Daughenbaugh to protect him from the blows. Similarly, at some juncture during the confederates' assaultive onslaught, Tyler could reasonably expect that the crime of murder would be committed as the crime was ongoing and Tyler placed Daughenbaugh at risk of danger. In *Conner v. State*, 362 N.W.2d 449, 456 (Iowa 1985), a case involving joint criminal conduct, our supreme court stated, "We have long held, and it is general

---

[5] I do not suggest a different outcome of the case would have resulted if such jury instructions were given.

[6] Jury instruction numbers 15 and 19.

law of this nation, that an accessory is responsible for everything done by the principal that is incidental to carrying out the illegal act—even though the injury was greater than planned." Since *Conner*, our supreme court has also noted that criminal responsibility lies upon the theory of joint criminal conduct even when the second crime is unplanned if it could "reasonably be expected to occur in furtherance of the first one." *Satern*, 516 N.W.2d at 844. I agree with the district court and the jury that there was substantial evidence to support Tyler's conviction on the theory of aiding and abetting and joint criminal conduct and to submit instructions to the jury on both theories.

The majority also concludes there is insufficient evidence of malice. An argument ensued between Tyler and Daughenbaugh from some contact between them. Evidence of bad feelings between the "defendant and the victim are circumstances that may be used to support a finding of malice aforethought." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003). Here, Tyler deliberately struck Daughenbaugh with enough force to knock him to the ground while surrounded with an army of confederates who Tyler could reasonably expect would join into the fray. I have no difficulty in finding malice aforethought on such facts. Then while the confederates assaulted Daughenbaugh to his death, Tyler callously stood aside.

There remains one issue to address. Because I have concluded there was not substantial evidence to support the conviction based upon individual liability, Tyler contends the conviction may not be upheld as the verdict was a general verdict.

Because the jury was provided a general verdict and we cannot know which theory of liability they relied upon, Tyler contends that if there is not sufficient evidence to support a finding of guilt under any one of the theories, his conviction must be reversed. The State contends the case law cited by Tyler only applies if one or more of the theories should not have been submitted to the jury due to legal error rather than insufficiency of the evidence.

The State contends when the defendant challenges the general verdict on the basis of insufficient evidence, the controlling case is *Griffin v. United States*, 502 U.S. 46 (1991). In that case, the United States Supreme Court reasoned:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to the law— whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.

*Griffin*, 502 U.S. at 59. The court held a general verdict need not be set aside "because one of the possible bases of conviction was . . . unsupported by sufficient evidence." *Id.* at 56.

Notwithstanding *Griffin*, our supreme court has continued its long-standing position that juries need not agree on the same alternative where multiple theories are instructed so long as there is substantial evidence in the record to support each theory. *State v. Corsi*, 686 N.W.2d 215, 222 (Iowa 2004). And if there is not substantial evidence for each theory, the defendant is entitled to a new trial. *See State v. Smith*, 739 N.W.2d 289, 294–95 (Iowa 2007). Here, the

jury was instructed that each juror was not required to agree as to "which theory or fact leads to his or her verdict."[7]  In the recent opinion *State v. Thorndike*, ___ N.W.2d ____, 2015 WL 821549, at *5 (Iowa 2015), our supreme court acknowledged that in *State v. Tejeda*, 677 N.W.2d 744, 754-55 (Iowa 2004), it continued to recognize that "an instruction submitting an issue unsubstantiated by evidence is generally prejudicial."  Ultimately, in *Thorndike*, the court upheld the verdict, finding no prejudice, as the issue was raised in an ineffective assistance of counsel context.  2015 WL 821549, at *6.  Here, the issue is not raised in the context of ineffective assistance of counsel, but I believe there was no prejudice because the State's own evidence clearly indicated that Tyler alone did not inflict the fatal blow.  Further, there is no suggestion the State ever contended Tyler's blow by itself was the cause of Daughenbaugh's death.  Under these facts, there was no prejudice, and the inclusion of the individual liability issue was superfluous and should not entitle Tyler to a new trial.  Although I agree with the majority that Tyler may not be criminally liable on an individual basis, I would affirm his conviction.

---

[7] Jury instruction number 20.