PEOPLE v BOWLES

Docket No. 114661. Decided March 28, 2000. On application by the defendant for leave to appeal, the Supreme Court, in lieu of granting leave, affirmed the judgments of the Court of Appeals and the trial court.

Gary Bowles was convicted following a bench trial in the Washtenaw County Trial Court, Kurtis T. Wilder, J., of first-degree felony murder and second-degree murder. The Court of Appeals, SAAD, P.J., and MICHAEL J. KELLY and BANDSTRA, JJ., affirmed, rejecting the defendant's argument the evidence was insufficient because the victim's death resulted from the intervening cause of her removal from life support systems. 234 Mich App 345 (1999) (Docket No. 203825). The defendant seeks leave to appeal.

In a unanimous opinion per curiam, the Supreme Court *held*:

There was no separate intervening cause, only the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of fatal injuries.

The implementation of a decision to terminate life-support treatment is not the cause of a patient's subsequent death. Instead, the discontinuance of life-support measures merely allows the patient's injury or illness to take its natural and inevitable course. The victim's death was the natural and inevitable result of the injuries inflicted by the defendant, notwithstanding the temporary postponement of that result through artificial respiration.

Affirmed.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, and *David A. King*, Assistant Prosecuting Attorney, for the people.

Gary Bowles in propria persona.

PER CURIAM. The defendant was convicted of first-degree murder for the beating death of his aunt. The

Court of Appeals affirmed. We likewise affirm, though on a slightly different basis.

I

The defendant's mother and his aunt, the victim of this crime,[1] lived in adjacent homes in Ypsilanti. The aunt was seventy-nine years old, and evidently had begun to experience the early stages of Alzheimer's disease. One of her nieces visited her daily to see that all was well, and to provide needed assistance.

After a visit on the afternoon of March 10, 1996, the victim's niece returned home. About an hour later, she was telephoned by a neighbor of the victim, who alerted her that the defendant was in the victim's house. She phoned the victim, who said the defendant was asking for money. The women agreed that the victim would give the defendant no money and would ask him to leave.

The following day, March 11, the victim did not answer the phone when her niece attempted to contact her from work. Worried about her aunt, the niece left her place of employment and drove to the victim's home. Breaking in, she found her aunt lying on the floor, badly beaten. Emergency personnel took her to the hospital.

Other than the damage that occurred when the niece forced her way into the home, there were no signs of a break-in. However, two television sets were missing.

The defendant was soon arrested, and was questioned in the early morning hours of March 12. He

---

[1] The victim was the widow of the defendant's uncle, and thus was the defendant's aunt by marriage.

acknowledged going to the victim's house for the purpose of getting money to support his drug habit. While there, he formed the plan of stealing her television sets. He struck her several times, and left her on the floor.

These events left the defendant with a visibly bruised right hand (which he attributed to another cause). The police also located the persons to whom the defendant had sold the stolen property.

The victim was comatose and on a respirator. It soon became evident to the physicians that she would not recover from her injuries.[2] On the basis of medical advice, the victim's family decided on March 14 to allow her to breathe on her own. The injuries to her brain prevented the body from delivering enough oxygen to the heart, and she suffered cardiac arrest about eight and one-half hours after the respirator was removed.

II

The defendant was charged in a two-count information. Count I alleged first-degree (felony) murder in

---

[2] Her treating physician testified that she "had what I would consider the most severe neurologic injury" and that she "made no neurologic improvement." He also explained:

> Her chance, her prognosis, her chance for surviving that injury and leaving the hospital alive statistically was less than ten percent. And her chance for functional recovery, in other words leaving the hospital breathing on her own, functional approach was zero; that's given the severity of her injury, the combination of her age. You can make a very good estimate of the likelihood of her surviving and any functional recovery.

the course of a robbery. Count II was an open-murder allegation. MCL 750.316; MSA 28.548.[3]

The defendant waived a jury, and was tried by a judge of the Washtenaw County Trial Court.[4] The prosecution presented the facts set forth above. The defendant testified that the victim began pushing him and that he "accidently with my reflex struck her." She then began hitting him, and "I felt like I was in danger because she was trying to assault me, which she did." He then began hitting her in the face.

In closing argument, defense counsel asked the court to find that the defendant had not intended to harm the victim. At no time before or during trial did the defendant argue that the family decision to allow the victim to breathe on her own was an intervening cause that could relieve him of liability for her death.

The trial court found the defendant guilty of felony-murder and, on count II, second-degree murder. The court imposed life sentences on both counts, and then vacated the sentence on count II.[5]

In the Court of Appeals, the defendant argued for the first time that the evidence had been insufficient because "the victim's death was caused by the intervening cause of removal from life support systems, which were required to sustain the life of the victim, under the circumstances presented in this case."

---

[3] The prosecuting attorney also filed a notice that the defendant was subject to enhanced sentencing as an habitual offender. MCL 769.10; MSA 28.1082.

[4] See Administrative Order No. 1996-2, 450 Mich cxxvi (1996), and Administrative Order No. 1997-12, 456 Mich clxxxi (1997).

[5] No mention was made of sentence enhancement under MCL 769.10; MSA 28.1082.

The Court of Appeals rejected this argument, and affirmed the defendant's conviction and sentence for first-degree murder. 234 Mich App 345; 594 NW2d 100 (1999).

The defendant has now applied to this Court for leave to appeal.

III

The Court of Appeals affirmance is premised on two grounds. The first is the Determination of Death Act, MCL 333.1031 *et seq.*; MSA 14.15(1031) *et seq.*[6] Applying language found in MCL 333.1033(1); MSA 14.15(1033)(1), the Court of Appeals offered the view that "[a] rational trier of fact could have found that the victim came within the statutory definition of being 'dead' before being removed from the ventilator." 234 Mich App 350.

However, there was no need for the Court of Appeals to address the statute because, as explained below, the court correctly determined under well-established common-law causation principles that the victim's removal from life support was not an intervening cause of death. Accordingly, we specifically find its interpretation of the statute to be of no precedential value.

The second ground on which the Court of Appeals affirmed the defendant's conviction was that the death was caused by the defendant's actions, not by an intervening cause. The Court explained:

---

[6] The Determination of Death Act, 1992 PA 90, is a uniform measure that, with variation, has been enacted in thirty-one states, the District of Columbia, and the Virgin Islands. It was drafted by the National Conference of Commissioners on Uniform State Laws and was enacted after its adoption was recommended by the Michigan Law Revision Commission.

Alternatively, even if the trier of fact did not conclude that the victim was legally dead before being removed from the respirator, that would not mean the decision to remove artificial respiration was an intervening cause of death absolving defendant of liability. We agree with the statement in *In re Rosebush*, 195 Mich App 675, 692; 491 NW2d 633 (1992), that "the implementation of a decision to terminate life-support treatment is not the cause of the patient's subsequent death. Instead, the discontinuance of life-support measures merely allows the patient's injury or illness to take its natural and inevitable course." See, also, *People v Vanderford*, 77 Mich App 370, 372-373; 258 NW2d 502 (1977). The victim's death was the "natural and inevitable" result of the injuries inflicted by defendant, notwithstanding the temporary postponement of that result through artificial respiration. [234 Mich App 350-351.]

This is correct. The present case involves no separate intervening cause. Rather, we find in these facts only the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of fatal injuries.[7]

For these reasons, we affirm the judgments of the Court of Appeals and the trial court.[8] MCR 7.302(F)(1).

WEAVER, C.J., and CAVANAGH, KELLY, TAYLOR, CORRIGAN, YOUNG, and MARKMAN, JJ., concurred.

---

[7] Decisional authority on this narrow point is scarce, and sometimes distinguishable. However, appellate decisions are consistent in rejecting arguments such as those framed by the defendant in the present case. See, for example, *Ewing v State*, 719 NE2d 1221, 1225 (Ind, 1999); *Carrigg v State*, 696 NE2d 392, 395-396 (Ind App, 1998); *Porter v State*, 308 Ark 137, 144-145; 823 SW2d 846 (1992); *Eby v State*, 702 P2d 1047, 1048-1049 (Okla Crim App, 1985).

[8] We note the second issue raised by the defendant, but find it to be without merit.