**STATE of Iowa, Plaintiff–Appellee,**

**v.**

**Troy FOX, Defendant–Appellant.**

**No. 10–2046.**

Court of Appeals of Iowa.

Nov. 9, 2011.

Mark C. Smith, State Appellate Defender, and David Adams, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Benjamin M. Parrott, Assistant Attorney General, Jerry Vander Sanden, County Attorney, and Nicholas Maybanks, Assistant County Attorney, for appellee.

Heard by DANILSON, P.J., and TABOR and MULLINS, JJ.

DANILSON, P.J.

Troy Fox appeals from the judgment and sentence, following a jury trial, for the offense of homicide by vehicle, in violation of Iowa Code section 707.6A (2009). Fox contends the district court erred in finding there was sufficient evidence to support his conviction. Specifically, Fox claims the victim's conscious decision to remove life-sustaining medical assistance constituted an intervening and superseding cause of death. Upon our review, we conclude the victim's decision to be removed from life support, after consultation with medical personnel, was a "normal" consequence of the harm inflicted by Fox's criminal conduct, and not a superseding cause of death. Substantial evidence supports Fox's conviction for homicide by vehicle, and we affirm.

## I. Background Facts and Proceedings.

On Sunday, October 4, 2009, Troy Fox got off work at Jaimen Restaurant in Cedar Rapids at about 10:00 p.m. He went to Papa's Sports Bar in Hiawatha to meet his friend, Ruben Mayo, for some drinks. Fox consumed two drinks there, each containing about 1.5 ounces of rum. Fox and Mayo left together at approximately 11:45 p.m. and were talking about going to a nearby bar named Sammy's. They were next seen arriving at Tailgaters bar in Cedar Rapids around 12:00 a.m. Fox consumed two more drinks, each containing about one ounce of rum. Fox finished the second drink by drinking it rapidly. The two left Tailgaters at approximately 12:45 a.m. and then went to a bar called the Green Gable until bar closing at 2:00 a.m.

At approximately 2:30 a.m., Fox drove north on Interstate 380 in Cedar Rapids. Fox's vehicle went "flying around" a Wonderbread truck at a high speed, "swerved" and "veered" across multiple lanes of traffic "ten, twelve times," and came to a stop by striking a utility pole on the east side of the highway. The driver of the Wonderbread truck called 911. When rescue workers arrived on the scene, both Fox and Mayo were unconscious, and Mayo had no pulse. Although a paramedic failed in "three if not four" attempts to find a pulse, Mayo's heart suddenly began to beat again, and he spontaneously started to take irregular breaths. Rescue workers stabilized Mayo's neck, extricated him from the vehicle, and strapped him to a backboard. They first provided Mayo with supplemental oxygen, and then began breathing for him using a bag-valve mask.

Fox was transported to St. Luke's Hospital in Cedar Rapids. His blood was drawn for testing and revealed a blood alcohol level of .251. Fox suffered no permanent injuries from the crash.

Mayo was also taken to St. Luke's Hospital, where hospital staff intubated him using an endotracheal tube because his oxygen saturation was low. He could not breathe on his own after he was intubated. After an hour, Mayo was transferred by

helicopter to University of Iowa Hospitals in Iowa City for a neurological consultation and specialized trauma care. Mayo was diagnosed with fractures of five of his seven cervical vertebrae, nine of his twelve thoracic vertebrae, as well as disruption in the longitudinal ligaments of his cervical spine. He also suffered a relatively less traumatic brain injury.

Doctors determined Mayo suffered "a complete spinal cord injury, which means there is no motor or sensory function below the level of the spinal cord injury" to his neck. Doctors agreed Mayo's condition was permanent, as the prognosis for recovery from such injury is "extremely low." Further, Mayo would likely need a ventilator to breathe for the rest of his life. The supervising trauma surgeon testified he had seen "150–180 spinal cord/spinal column injuries in the course of a year" for thirty-three years, yet had "never seen a miraculous recovery."

Doctors explained that Mayo would not be able to move his arms or legs and would be wheelchair dependent. He had tubes in his bladder to control waste, was not able to control bowel movements, and was provided fluids and medicine through intravenous lines. He would be prone to skin ulcers and bed sores. He would be dependent on a ventilator and subject to increased risk of infection and pneumonia. Doctors could not predict how long Mayo would live, but that it would be less than normal life expectancy. Significant financial costs would also be associated with Mayo's care. Doctors relayed this information to Mayo's family, which was "adamant" that Mayo would not want to live under such circumstances.

Doctors ceased administering sedatives to Mayo and were able to establish reliable communication with him using his ability to blink. Mayo was able to answer yes or no questions by blinking once for "yes," and twice for "no." The treating physician determined Mayo was rational and could understand him after it was clear Mayo was giving "consistent," "accurate," and "credible" answers to "a bunch of questions" that he and his family "should know about." The treating physician then proceeded to explain Mayo's condition to him. Mayo indicated "he did not want to go forward," and did not want to continue receiving life support measures.

Doctors allowed Mayo and the family some time to consider this decision. Mayo remained consistent with his wishes. Pursuant to Mayo's directive, life support was removed, and Mayo died within a few hours as a result of lack of oxygen caused by his spinal cord injury. His death occurred six days after the accident. An autopsy confirmed Mayo's spinal cord was dead, would not have regenerated, and had caused his inability to breathe.

On December 23, 2009, the State charged Fox by trial information with homicide by vehicle, in violation of Iowa Code section 707.6A. Fox filed a written arraignment and plea of not guilty on January 8, 2010. The State filed an amended trial information on October 8, 2010, which was not resisted by Fox.[1] A jury trial commenced on October 18, 2010. At the close of the evidence after the jury was excused, defense counsel moved for directed verdict, alleging Mayo's decision to terminate life support was an intervening cause of death for which Fox could not be held responsible. The court denied the

---

1. The amended trial information added the language "or while having an alcohol concentration of .08 or more" pursuant to section 707.6A as a mere formality to establish a clear record of what the parties "realized and intended to be the proper basis of the charge" against Fox.

motion. On October 22, 2010, the jury returned its verdict of guilty. The district court sentenced Fox to serve an indeterminate term of imprisonment not to exceed twenty-five years. Fox now appeals.

## II. Scope and Standard of Review.

Our scope of review is for errors at law. Iowa R.App. P. 6.907. A verdict will be upheld where there is substantial evidence in the record supporting each element of the charge. *State v. Hennings*, 791 N.W.2d 828, 832 (Iowa 2010). Substantial evidence means evidence which would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *Id.* We view the record in the light most favorable to the State. *Id.* at 832–33. We draw legitimate inferences and presumptions that fairly and reasonably arise from the evidence in the record. *Id.* at 833. The jury is free to give each piece of evidence the weight it deserves, "to place credibility where it belongs," and to accept or reject any witness's testimony. *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

## III. Analysis.

Fox contends the district court erred in finding there was sufficient evidence to support his conviction. Specifically, Fox claims Mayo's conscious decision to remove life-sustaining medical assistance constituted an intervening and superseding cause of death.

*A. Elements of the Crime.* The jury found Fox guilty of homicide by vehicle. *See* Iowa Code § 707.6A ("A person commits a class 'B' felony when the person unintentionally causes the death of another by operating a motor vehicle while intoxicated, as provided by section 321J.2."). The district court instructed the jury that the State must prove the following three elements to enter a guilty verdict on that charge:

1. On or about the 5th day of October 2009, the Defendant:

   (a) operated a motor vehicle while under the influence of alcohol, or

   (b) operated a motor vehicle while having an alcohol concentration of .08 or more.

2. The Defendant's acts set out in Element 1 unintentionally caused the death of Ruben Mayo.

3. The Defendant's operation of a motor vehicle while under the influence of alcohol or while having an alcohol concentration of .08 or more was a proximate cause of the death of Ruben Mayo.

Jury Instruction No. 17. There is no dispute the first two elements were met. Fox had a blood alcohol level of .251 at the time of the accident that caused Mayo's death. There is no doubt Mayo would be alive today but for Fox's operation of a motor vehicle while intoxicated. Indeed, Fox concedes his actions were a cause-in-fact of Mayo's death.

The sole issue on appeal is the third element: whether Fox's acts were a proximate cause of Mayo's death. The court instructed the jury as follows on proximate cause:

The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct. "Substantial" means the party's conduct has such an effect in producing damage as to lead a reasonable person to regard it as a cause.

Jury Instruction No. 22.

*B. Legal Causation.* The principles of causation normally associated with civil tort litigation are pertinent in criminal cases. *State v. Garcia*, 616 N.W.2d 594,

596 (Iowa 2000).[2] In determining the legal cause of death, our supreme court has endorsed the following principle:

[A]n act is a cause of an event if two conditions are satisfied: the event would not have occurred without the act; [and] the act made the event more likely. The first condition is necessary to distinguish the attempted from the completed crime, the second to rule out cases in which, while the event in question would not have occurred but for the act, the act did not create the kind of dangerous condition that would make such events more likely to occur.

*State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994) (quoting *Brackett v. Peters*, 11 F.3d 78, 79 (7th Cir.1993)).

■ Following this principle, the court has explained that "[a] defendant can be relieved of criminal responsibility if an intervening act breaks the chain of causal connection between the defendant's actions and the victim's death." *Garcia*, 616 N.W.2d at 597. "However, for an intervening act to relieve a defendant of criminal responsibility for homicide, the intervening act must be the *sole* proximate cause of death." *Id.; see also State v. Hubka*, 480 N.W.2d 867, 869 (Iowa 1992) ("[A] defendant cannot escape criminal responsibility for homicide merely because factors other than his acts contributed to the death, provided such other factors are not the sole proximate cause of death.").

Our supreme court further explained, "[t]he intervention of a force which is a *normal consequence* of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Murray*, 512 N.W.2d at 551 (quoting Restatement (Second) of Torts § 443 (1965)). The court also noted that "normal" in this sense is not used to describe a consequence that is "usual, customary, foreseeable, or to be expected." *Id.* (quoting Restatement (Second) of Torts § 443 cmt. b). Instead, "normal" in this sense "means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events." *Id.*

■ *C. Substantial Evidence.* Upon our review of the facts of this case, we conclude the accident on October 5, 2009, was the legal cause of Mayo's death. The evidence shows Mayo was healthy before

**2.** Our supreme court has recently clarified the principles of proximate causation, now termed "scope of liability." *See Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 740–43 (Iowa 2009) (refocusing the analysis of legal causation from the foreseeability of harm to a risk-based standard); *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009) (adopting the risk standard for proximate cause, as articulated by the Restatement (Third) of Torts, which addresses "factual cause" and "scope of liability" separately). Because the underlying criminal acts occurred before the court's clarification, however, the district court did not instruct the jury on this standard, Fox does not reference the recent cases on appeal, and accordingly, we have not analyzed the facts upon the Restatement (Third) principles.

Even so, upon consideration of the risks that made Fox's conduct criminal, we would still determine that the harm to Mayo was a result of those risks under a scope of liability assessment. *See, e.g., Thompson*, 774 N.W.2d at 838–39 ("When, as in this case, we have been called upon to consider the role of an intervening or superseding cause, the question of the foreseeability of the superseding force has been critical."). Specifically, we would conclude a reasonable fact finder could determine Fox should have known that drinking alcohol impairs drivers; an intoxicated driver could cause a car accident that would endanger or cause the death of the car passengers; and that an accident victim placed on life support systems may choose to be withdrawn from life sustaining procedures.

the accident. The accident caused Mayo to suffer a complete spinal cord injury, rendering him without motor or sensory function below his neck and unable to breathe on his own. Mayo's spinal cord was dead and would not have regenerated. The decision to remove Mayo from life support was a "normal" consequence of the situation created by Fox's criminal conduct.

Our supreme court has previously determined a victim's family's decision to cease life support was not a sufficiently independent act to relieve the defendant of responsibility for the victim's death. *Id.* at 547. In that case, the defendant bludgeoned his victim to the point she had no neurological activity in her cerebral cortex. *Id.* at 549. Over time, when the victim's condition did not improve, her family decided to withdraw life support procedures. *Id.* The court determined "the medical decisions for cessation of medication and nourishment were as a matter of law normal consequences of the situation created by Murray's criminal conduct." *Id.*

Fox attempts to distinguish this case from *Murray* and similar cases, including *Garcia*, 616 N.W.2d at 599–600 (observing that a criminal defendant will rarely be relieved from responsibility for the death of the victim based on intervening medical care as a intervening and superseding cause, even where the care constitutes medical malpractice and is "grossly negligent"), and *State v. Inger*, 292 N.W.2d 119, 125 (Iowa 1980) ("It is well established that ordinarily negligent treatment or neglect of an injury will not excuse a wrong done unless the treatment or neglect was the sole cause of death."). Fox observes that in those cases, "the death of the individual could be viewed, in the crudest of terms, as involuntary" because "[t]he injured party had no opportunity to say and was never presented with an option of

living and dying." Fox states that "[t]he decisions of families and the negligent acts of others [in those cases] resulted in the death of the individual and completed the chain of causation between the criminal act and the death."

Unlike the facts in *Garcia* and *Inger*, Fox alleges "here, Ruben Mayo, in the days preceding his death, was awake, mentally aware, medically stable, and informed of the extent of his injuries." Fox further points out that Mayo was "informed he could live for an untold number of years," and understood "the removal of the ventilator would result in his death." Fox contends that at the point Mayo was able to communicate and decide his own fate, prior to his decision to be removed from the ventilator, the evidence only supported a conviction for serious injury by vehicle in violation of Iowa Code section 707.6A(4). Fox argues that due to "the nature and the quality of Ruben Mayo's decision to end his own life, to choose his own death," this court should recognize Mayo's decision as an intervening and superseding cause sufficient to relieve Fox of liability for Mayo's death.

We disagree. Although our supreme court has not addressed this exact issue (a victim's *own* decision to remove life support), the court has determined that a victim's family's decision to remove life support does not constitute an intervening and superseding cause of death. *Murray*, 512 N.W.2d at 547. We find the court's analysis and conclusion in Murray to be persuasive in this case. We do not believe the court would restrict its holding to a situation where a victim's *family* made the decision on behalf of the victim. Here, as in Murray, the informed, deliberate, and willful medical decisions for cessation of life support procedures were as a matter of law normal consequences of the situa-

tion created by Fox's criminal conduct. *See id.* at 549.

This finding is in line with persuasive conclusions of other state courts as well. *See, e.g., State v. Pelham,* 176 N.J. 448, 824 A.2d 1082, 1092–93 (2003); *People v. Bowles,* 461 Mich. 555, 607 N.W.2d 715, 718 (2000); *People v. Caldwell,* 295 Ill. App.3d 172, 229 Ill.Dec. 675, 692 N.E.2d 448, 454 (1998); *State v. Ruane,* 912 S.W.2d 766, 775 (Tenn.Crim.App.1995). In *Caldwell,* the Illinois Court of Appeals observed:

> In Illinois, a competent person has the right to refuse all types of medical treatment, including life-saving or life-sustaining procedures. [Here, the victim]'s decision to remove artificial life support was consistent with Illinois policy and was the natural and foreseeable result of defendant's wrongful act. The cause of her death was not the removal of the ventilator, but the criminal act that defendant performed which generated the need for the life support in the first instance.

*Caldwell,* 229 Ill.Dec. 675, 692 N.E.2d at 455. And the New Jersey Supreme Court similarly found:

> We agree with the widely recognized principle that removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability. Removal of life support in conformity with a victim's expressed wishes is not a legally cognizable cause of death in New Jersey....
>
> Removal of life-sustaining treatment is a victim's right. It is thus foreseeable that a victim may exercise his or her right not to be placed on, or to be removed from, life support systems. Because the exercise of the right does not break unexpectedly, or in any extraordinary way, the chain of causation that a

defendant initiated and that led to the need for life support, it is not an intervening cause that may be advanced by the defendant.

*Pelham,* 824 A.2d at 1092–93. In a case where the family made the decision to remove life support, the Michigan Supreme Court aptly summarized, "The present case involves no separate intervening cause. Rather, we find in these facts only the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of fatal injuries." *Bowles,* 607 N.W.2d at 718. The same conclusion can be reached in regard to Mayo's decision.

Our supreme court has also stated, "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Polk Cnty. Sheriff v. Iowa Dist. Court for Polk Cnty.,* 594 N.W.2d 421, 426 (Iowa 1999) (quoting *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224, 241 (1990)); *see also* Iowa Code §§ 144A.3 ("A competent adult may execute a declaration at any time directing that life-sustaining procedures be withheld or withdrawn."); 144A.6 ("A qualified patient has the right to make decisions regarding use of life-sustaining procedures as long as the qualified patient is able to do so.").

■ Fox also attempts to support his contention with an analogy comparing Mayo's decision to withdraw life support procedures with suicide, by noting that Iowa considers suicide a deliberate, intentional, and intervening act that precludes another person's responsibility. *See Jain v. State,* 617 N.W.2d 293, 300 (Iowa 2000). We find this argument to be without merit. As the State advances, Mayo's choice to withdraw life support "merely allowed the still-operative consequences of Fox's act to

take their course." Moreover, our supreme court has observed:

> There is a distinction between a person suffering from a serious life-threatening disease or debilitating injury who rejects medical intervention that only prolongs but never cures the affliction and an individual who deliberately sets in motion a course of events aimed at his or her own demise and attempts to enlist the assistance of others. In the former case, we may presume the patient's motive is not to commit suicide; in the latter, the motive is clearly to commit suicide.

*Polk Cnty. Sheriff*, 594 N.W.2d at 427 (internal quotation removed); *see also Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 122 (Iowa 2011) ("When a patient's suicide is a foreseeable consequence of the medical provider's negligent care, the act of suicide cannot be deemed a superseding intervening cause." (citation omitted)). In this case, when Mayo's ventilator was removed, Mayo survived for a few hours before dying as a result of a lack of oxygen caused by his spinal cord injury. In contrast, suicide is an act that introduces new harms, distinct from those occasioned by the original criminal behavior. *See Polk Cnty. Sheriff*, 594 N.W.2d at 427. As the court has recognized, these situations are not comparable. *Id.*

The operative facts of this case are not distinguishable from the cases previously addressed by our supreme court involving a victim's traumatic or debilitating injury and end-of-life decisions, and where the court determined the decisions to remove life support or conduct surgery did not constitute an intervening or superseding cause relieving a defendant of criminal responsibility. *Murray*, 512 N.W.2d at 551 (observing that a jury or court, in looking at the matter after the event, does not regard the intervention of the new force as so extraordinary as to fall outside the class of normal events); *see also Garcia*, 616 N.W.2d at 597–99 (noting that in order for an intervening act to relieve a defendant of criminal responsibility for homicide, the intervening act must be the *sole* proximate cause of death); *Inger*, 292 N.W.2d at 125 (concluding the State presented sufficient evidence from which the jury could have found the trauma inflicted by defendant was the proximate cause of the victim's death). We conclude the decision to remove Mayo from life support was a normal consequence of the harm inflicted by Fox's criminal conduct.

## IV. Conclusion.

We conclude the district court correctly denied Fox's motion for directed verdict. There is substantial evidence to support his conviction of homicide by vehicle. We therefore affirm Fox's conviction and sentence.

**AFFIRMED.**