Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000004
22-MAR-2019
01:14 PM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MICHAEL LIMJUCO ABELLA, Defendant-Appellant

NO. CAAP-16-0000004

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 14-1-1253)

MARCH 22, 2019

GINOZA, CHIEF JUDGE, FUJISE AND REIFURTH, JJ.

OPINION OF THE COURT BY GINOZA, C.J.

Defendant-Appellant Michael Limjuco Abella (**Abella**) appeals from the "Judgment Guilty Conviction and Sentence" entered on December 16, 2015 by the Circuit Court of the First Circuit (**Circuit Court**).[1] Plaintiff-Appellee State of Hawai'i (**the State**) charged Abella with one count of Murder in the Second Degree pursuant to Hawaii Revised Statutes (**HRS**) § 707-701.5

---

[1] The Honorable Colette Y. Garibaldi presided.

(2014).[2]  After a jury trial, Abella was convicted of Manslaughter in violation of HRS § 707-702(1)(a) (2014).[3]  The Circuit Court sentenced Abella to a term of imprisonment for twenty years.

On appeal, Abella argues that the Circuit Court: (1) plainly erred by not instructing the jury regarding the causal connection or lack thereof between Abella's conduct and the death of victim Shelton Higa (**Higa**); (2) erred by not applying HRS § 327E-13 (2010)[4] to his case; and (3) erred by "not granting a mistrial upon the prosecution's misconduct of attempting to elicit testimony of why Abella did not go or report to police of what occurred between himself and Higa."

For the reasons discussed below, we affirm.

I.   **Background**

A.   **The State's Case**

The State's witnesses testified as follows, in pertinent part:

Ronald Landrio (**Landrio**), a witness at the crime scene, testified that on July 17, 2014, at approximately 8:45 p.m., at the intersection of Smith and Pauahi Streets in Honolulu, Hawai'i, he looked in the direction of the sound of a glass bottle breaking and saw Higa falling to the ground.  Donald King (**King**), another witness at the scene, testified to the same.

---

[2]  At the time of the offense, HRS § 707-701.5 provided:

> **[§707-701.5]  Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>     (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[3]  HRS § 707-702(1)(a) provides:  "(1) A person commits the offense of manslaughter if: (a) The person recklessly causes the death of another person[.]"

[4]  The relevant text of HRS § 327E-13 is provided, *infra*.

2

Landrio and King further testified that they saw Abella next to Higa, and that Abella was kicking and/or hitting Higa while Higa was on the ground. King also testified that Higa was being hit on the head by Abella, and that Higa was trying to cover his face and his head. Landrio testified that as Higa was being attacked, a group of people approached Higa and Abella, at which point Abella left the scene.

Officer Celestino Herana (**Officer Herana**), a police officer for the Honolulu Police Department, testified that he was called to the scene at approximately 8:54 p.m. Officer Herana conversed with Higa who seemed "coherent," took photographs at the scene, and departed.

Kell Tanabe, Jr. (**Tanabe**), a paramedic for the City and County of Honolulu, testified that he was part of an ambulance crew called to the scene at 9:04 p.m. Tanabe testified that Higa was not taken to the hospital because he refused to go.

Antoinette Tuituu (**Tuituu**), also a witness at the scene, testified that she arrived before the ambulance departed, saw Higa trying to get up on his hands and knees, and was asked by Higa to call the ambulance again because he felt dizzy.

At that point, however, Landrio and Tuituu testified that Abella returned and started to hit Higa on the head again. King also testified that Abella repeatedly kicked Higa's head upon returning. Tuituu testified that she ran to a nearby police station to call for help, and upon her return, she saw Abella walking away. King and Tuituu further testified that they followed Abella away from the scene and eventually caught up with him.

Officer Herana testified that at approximately 9:42 p.m., he was responding to another assault call and was dispatched to the same intersection. However, as he was responding to that call, his Sergeant contacted him regarding a

possible witness to the assault case.[5]  At approximately 10:08 p.m., Officer Herana went to the area of Beretania and Bishop Streets, where he arrested Abella.

Ashley Hashimoto (**Hashimoto**), a student intern paramedic at the time of the offense, testified that at approximately 9:52 p.m., she responded to an assault call and helped transport Higa to Queen's Hospital in Honolulu (**Queen's**).

Susan Steinemann, M.D. (**Dr. Steinemann**), a trauma and general surgeon, testified that she saw Higa on July 17, 2014, after he was treated by the emergency room doctor and had had a CT scan of his brain.  Higa was comatose by the time Dr. Steinemann examined him.  Dr. Steinemann testified that Higa had a large subdural hematoma, which she described as "deadly" bleeding inside the skull.  Dr. Steinemann recommended emergency surgery.

Eric Oshiro, M.D. (**Dr. Oshiro**), a neurosurgeon, testified to the following: on July 17, 2014, Higa was sedated prior to his CT scan, after which he never regained consciousness, and required the use of a ventilator.  After reviewing Higa's CT scan, Dr. Oshiro determined that Higa had a "life-threatening" blood clot on the surface of his brain and a "dilated pupil" which was indicative of brainstem compression. Also on July 17, 2014, Dr. Oshiro performed a craniotomy on Higa, which Dr. Oshiro described as "removing a portion of the skull bone to gain access to the brain" in order to "remove the pressure on the brain by removing the space-occupying blood clot that's sitting underneath the skull."  Dr. Oshiro testified to "satisfactory results" and that Higa continued to be on a ventilator after surgery.

On cross-examination, defense counsel asked Dr. Oshiro questions regarding Higa's health between the craniotomy and his death twelve days later, based on Higa's medical chart.

---

[5]  It is not clear from the record to which assault case the witness pertained.

According to the chart, on July 21, Higa opened his eyes slightly, which Dr. Oshiro said "indicates a slight bit of consciousness." On July 22, Higa blinked to a threat, which Dr. Oshiro said "shows a slight improvement in consciousness. . . . More so than previous." On July 25, Higa was "clearly localizing with his left arm" which Dr. Oshiro said is "somewhat of an improvement[.]" On July 28, Higa's "eyes open[ed] to voice" which Dr. Oshiro said was a "slight improvement in consciousness." On the same day, Higa's chart said "stable neurological exam" which Dr. Oshiro said means "not worsening." Dr. Oshiro could not recall whether he was physically present when the decision was made to take Higa off life support. On re-cross, Dr. Oshiro agreed that Higa could have survived a little longer beyond the date of his death occasioned by removal of life support.

Stephanie Higa (**Stephanie**), a nurse and Higa's daughter, testified that on July 27, 2014, she made the decision to remove her father from life support pursuant to his previously expressed wishes. Stephanie additionally testified on cross-examination that although she was not informed of improvements to Higa's condition regarding his neural exams throughout the previous ten days, she had never in her capacity as a nurse seen other people in states similar to her father's regain their faculties.

Dr. Steinemann testified that Higa was pronounced dead on July 29, 2014. Dr. Oshiro testified that the subdural hematoma was the cause of Higa's death.

Christopher Happy, M.D. (**Dr. Happy**), the chief medical examiner for the City and County of Honolulu, testified that on July 30, 2014, he performed an autopsy on Higa. Dr. Happy testified that he determined the cause of Higa's death was "[c]omplications from blunt force head injury with subdural hemorrhage." Dr. Happy further testified that there were no other contributing causes to Higa's death, such as Higa's pre-

5

existing kidney disease or other natural causes. Dr. Happy also testified that the toxicology report revealed morphine, administered at the hospital for pain control, and acetone, "which is sometimes formed after a prolonged period of a person being essentially brain dead." Dr. Happy testified that no illegal drugs presented in the report. On cross-examination, Dr. Happy repeated that "there were no other causes contributing to his condition" and that Higa's kidney disease did not contribute to his death.

### B. The Defense's Case

Abella elected to testify at trial. On direct examination, Abella testified that on July 17, 2014, at approximately 8:45 p.m., he was walking near the intersection of Smith and Pauahi Streets when a man approached him. The man asked Abella if he had a problem, and then hit Abella. Abella further testified that he hit back in self-defense before three additional men joined the fray. After the fight, Abella walked away. Abella denied being the source of the bottle, and denied knowing Higa before the incident.

On cross-examination, Abella identified Higa from a photograph as the person who asked him if he had a problem. Abella further testified that he hit Higa in the head three times with a closed fist in self-defense. Abella testified, "I was just swinging wild."

### C. Verdict and Sentence

The jury convicted Abella of Manslaughter. Abella was sentenced to twenty years imprisonment with credit for time served, to run concurrent with any other term of imprisonment.

## II. Standard of Review

### A. Jury instructions

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

6

> However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (brackets and citations omitted).

### B. Statutory interpretation

The interpretation of a statute is a question of law reviewable de novo. State v. Arceo, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (citations and internal quotation marks omitted).

> When construing a statute, the fundamental starting point is the language of the statute itself . . . and where the statutory language is plain and unambiguous, [the appellate courts'] sole duty is to give effect to its plain and obvious meaning. However, even when a statute is unambiguous, the legislative history may be consulted to confirm our interpretation.

State v. Reis, 115 Hawai'i 79, 100 n.1, 165 P.3d 980, 1001 n.1 (2007) (citations and internal quotation marks omitted).

### C. Mistrial

> The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. State v. Loa, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 . . . (1996) (citations omitted). "'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.'" State v. Ganal, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting State v. Furutani, 76 Hawai'i 172, 178-79, 873 P.2d 51, 57-58 (1994)).

State v. Plichta, 116 Hawai'i 200, 214, 172 P.3d 512, 526 (2007) (quoting State v. Rogan, 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999)).

### D. Prosecutorial misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error

complained of might have contributed to the conviction." State v. Austin, 143 Hawaiʻi 18, 28, 422 P.3d 18, 28 (2018) (citations and internal quotation marks omitted). "Factors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Sawyer, 88 Hawaiʻi 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998) (citation omitted).

## III. Discussion

### A.   Jury instruction

In his first assignment of error,[6] Abella argues:

> Here, there was an intervening act by numerous persons, other than Abella, i.e., medical treatment, and a decision made that terminated Higa's life. In other words, the result caused was "too remote" or "too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense." §702-215(2), HRS [2014];[7] see also §702-

---

[6] As an initial matter, we note that although Abella was charged with Murder in the Second Degree which requires an intentional or knowing state of mind, Abella was convicted of Manslaughter, which, in this context, instead requires a reckless state of mind. See HRS §§ 707-701.5; 707-702(1)(a). Therefore, the Circuit Court's failure to give a jury instruction pursuant to HRS § 702-215(2), regarding intentional or knowing causation, was harmless because said omission did not contribute to Abella's Manslaughter conviction. See Nichols, 111 Hawaiʻi at 337, 141 P.3d at 984 (holding that "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt." (emphasis added) (footnote omitted)).

[7] HRS § 702-215(2) provides:

> **§702-215 Intentional or knowing causation; different result from that intended or contemplated.** In the following instances intentionally or knowingly causing a particular result shall be deemed to be established even though the actual result caused by the defendant may not have been within the defendant's intention or contemplation:
>
> . . . .
>
> (2)   The actual result involves the same kind of injury or harm as the intended or contemplated result and is not too remote or accidental in its occurrence or too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense.

8

216(2), HRS [2014] (reckless or negligent causation).[8]

> "[W]hen read and considered as a whole, the instructions given [were] prejudicially insufficient, erroneous, inconsistent, [and] misleading", State v. Nichols, [111 Hawai'i at 334,] 141 P.3d at 981 [citations omitted], because the jury was not guided in determining whether Higa's death was "too dependent on another's volitional conduct." §702-215(2), HRS; see also §702-216(2), HRS (reckless or negligent causation).

(Record citation omitted). Abella acknowledges that no error was brought to the attention of the Circuit Court for either the giving or refusal to give a jury instruction in this regard. Instead, Abella asks this court to recognize plain error.

HRS § 702-216 differs from the Model Penal Code section from which it was adopted by, *inter alia*, adding the words "or too dependent on another's volitional conduct[.]" Compare HRS § 702-216, with Model Penal Code § 2.03(3)(b). The commentary to HRS § 702-215 provides, in relevant part:

> The Code follows the Model Penal Code as supplemented by the suggestion of Hart and Honore that provisions regarding liability for unintended or uncontemplated results must be separately stated for those instances when the difference in result is due to natural events and those instances when it is due to the volitional conduct of another.

(Footnotes omitted) (citing H.L.A. Hart & A.M. Honore, Causation in the Law (1959) (**Hart & Honore**)); see also HRS § 702-216 cmt.

---

8    HRS § 702-216(2) provides:

> **§702-216 Reckless or negligent causation; different result from that within the risk.** In the following instances, recklessly or negligently causing a particular result shall be deemed to be established even though the actual result caused by the defendant may not have been within the risk of which the defendant was or, in the case of negligence, should have been aware:
>
> . . . .
>
> (2)    The actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence or too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense.

(Emphasis added).

9

("Much of what has been said in the commentary on [HRS] §§ 702-214 and 215 applies with equal force to this section. The only difference is that this section deals with reckless and negligent causation.") According to Hart & Honore:

> The free, deliberate, and informed intervention of a second person, not acting in concert with the first, and intending to bring about the harm which in fact occurs or recklessly courting it, is normally held to relieve the first actor of criminal responsibility. One must distinguish, however, the situation where the first actor's conduct was sufficient in the existing circumstances to bring about the harm (e.g. a mortal wound . . .) from that where it was not sufficient without the intervention of the second actor.

Hart & Honore, at 292 (footnote omitted). In this sense, a volitional act of a third person is understood to mean one that is undertaken freely and with full awareness of the significance of one's actions. In turn, human intervention should not be considered to have an exonerating force if the intervenor was responding to a threat created by the original actor. See also 78 Colum. L. Rev. 1249, 1274, 1274 n.76 (1978) (citing Hart & Honore at 104-105, 130-31, 134-51, 292-94).

## 1. Medical treatment

At trial, Dr. Happy testified on direct examination that the subdural hematoma caused Higa's death, not any other disease or natural cause. During cross-examination, Dr. Happy repeated that there were no other contributing causes, and that any improvements in alertness following the craniotomy would not have made a difference in his final report.

Dr. Oshiro similarly testified on re-direct-examination by the State that the subdural hematoma killed Higa, not the sedation administered at the hospital or Higa's pre-existing renal disease.

Finally, Dr. Steinemann testified on direct examination that Higa's head injury would be "deadly" without emergency surgery. On re-direct, Dr. Steinemann testified that Higa's comatose state was due to his injury, not the sedation or anesthesia administered prior to the CT scan or craniotomy.

Abella's opening brief generally discusses testimony regarding Higa's medical treatment, but there is no argument about how such medical treatment was an intervening cause that contributed to Higa's death.  See Hawaiʻi Rules of Appellate. Procedure Rule 28(b)(7) ("[T]he appellant shall file an opening brief, containing[:] The argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on. . . .  Points not argued may be deemed waived.").  We conclude Abella has not demonstrated plain error in the jury instructions related to his apparent contention that the medical treatment was an intervening cause of Higa's death.

### 2. Removal of life support

Decisions from other jurisdictions have held that removal of life support is not an independent intervening cause in settings similar to the instant case.  We agree.

In People v. Bowles, 607 N.W.2d 715 (Mich. 2000), the defendant contended on appeal that the State's evidence on causation was insufficient because "the victim's death was caused by the intervening cause of removal from life support systems, which were required to sustain the life of the victim[.]"  Id. at 717.  In affirming the defendant's conviction, the Supreme Court of Michigan observed that "the implementation of a decision to terminate life-support treatment is not the cause of the patient's subsequent death.  Instead, the discontinuance of life-support measures merely allows the patient's injury or illness to take its natural and inevitable course."  Id. (citation omitted).  The court concluded that the case involved "no separate intervening cause.  Rather, we find in these facts only the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of [the] fatal injuries."  Id. at 718.

11

In <u>State v. Yates</u>, 824 P.2d 519 (Wash. Ct. App. 1992), <u>rev. denied</u>, 833 P.2d 1390 (Wash. 1992), the Court of Appeals of Washington denied the defendant's request for a jury instruction essentially charging that a victim's removal from life support could constitute an independent intervening cause sufficient to relieve the defendant of criminal liability. Because life support had been removed from one of the defendant's victims who had been in a persistent vegetative state following a gunshot wound to her head, the defendant argued that the jury should have been given the following instruction: "[i]n determining whether or not [the victim] died as a result of the defendant's acts, the State has the burden of proving beyond a reasonable doubt that the removal of food and water was not a new independent cause of death." <u>Id.</u> at 523. The court agreed with the trial court's rejection of the requested instruction, stating:

> [w]hen life support is removed, the cause of death is not the removal, but whatever agency generated the need for the life support in the first instance. Here, then, the removal of food and water could not have been a legally cognizable cause of death, and the court properly refused the proposed instruction.

<u>Id.</u> (citation omitted).

The California Court of Appeal used similar reasoning in <u>People v. Funes</u>, 28 Cal.Rptr.2d 758 (Cal. Ct. App. 1994), holding that the defendant was not entitled to an instruction on intervening causes because "as a matter of law, the decision to withhold antibiotics was not an independent intervening cause. Consequently, the court was not required to instruct on [that] issue." <u>Id.</u> at 768. The court noted that a trial court need not instruct on a theory which is not supported by the evidence. <u>Id.</u>; <u>see also</u> <u>State v. Taylor</u>, 130 Hawai'i 196, 206-07, 307 P.3d 1142, 1152-53 (2013) (similarly distinguishing when a defendant has or has not satisfied his burden to produce credible evidence to trigger the court's duty to instruct the jury on a particular defense). Because an independent intervening cause absolving the defendant from criminal liability must be "unforeseeable" or an

12

"extraordinary and abnormal occurrence," the court in <u>Funes</u> concluded that on the facts of the case before it "the decision to withhold antibiotics was, as a matter of law, not an independent intervening cause. Instead, it was a normal and reasonably foreseeable result of defendant's original act." <u>Funes</u>, 28 Cal.Rptr.2d at 769 (footnote omitted).

In <u>State v. Pelham</u>, 824 A.2d 1082 (N.J. 2003), the Supreme Court of New Jersey held that there was no error in instructing the jury that a victim's decision to invoke his right to terminate life support may not, as a matter of law, be considered an independent intervening cause capable of breaking the chain of causation triggered by defendant's wrongful actions. <u>Id.</u> at 1094. To support its holding, the <u>Pelham</u> court favorably cited, *inter alia*, <u>Bowles</u>, <u>Yates</u> and <u>Funes</u>. <u>Id.</u> at 1091-92. The <u>Pelham</u> court held that it agreed with "the widely recognized principle that removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability." <u>Id.</u> at 1092. The <u>Pelham</u> court further noted that "the defendant's desire to mitigate his liability may never legally override, in whole, or in part, the decisions of the physicians and the family regarding the treatment of the victim." <u>Id.</u> (brackets omitted) (citing <u>In re J.N.</u>, 406 A.2d 1275, 1282 (D.C. 1979)). The court also recognized that because removal of life-sustaining treatment is a victim's right, it is thus foreseeable, and in turn does not break in any unexpected or extraordinary way the chain of causation that a defendant initiated and that led to the need for life support. <u>Id.</u> at 1093. Thus, the court held, removal of life support is not an intervening cause that may be advanced by the defendant. <u>Id.</u>

In the instant case, the Circuit Court's instructions to the jury included the following:

> A person commits the offense of Manslaughter based upon reckless conduct if he recklessly causes the death of another person.
> There are two material elements of this offense, each of which the prosecution must prove beyond a reasonable doubt.

> These two elements are:
> 1. That on or about July 17, 2014, to and including July 29, 2014, in the City and County of Honolulu, State of Hawaii, the Defendant **caused the death of Shelton Higa**; and
> 2. That Defendant did so recklessly.

(Emphasis added). Further, the Circuit Court instructed the jury that: "[c]onduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." (Emphasis added).

We conclude there was no plain error based on the lack of a jury instruction regarding intervening acts by persons terminating Higa's medical treatment. Rather, considering the jury instructions as a whole, we conclude they were not prejudicially insufficient or erroneous. Nichols, 111 Hawaiʻi at 334, 141 P.3d at 981.

### B. HRS § 327E-13

Abella also argues that he should be acquitted because the Circuit Court failed to apply HRS § 327E-13(b) to his case.

HRS § 327E-13 provides, in relevant part:

> **§327E-13 Effect of this chapter.** (a) This chapter shall not create a presumption concerning the intention of an individual who has not made or who has revoked an advance health-care directive.
> (b) Death resulting from the withholding or withdrawal of health care in accordance with this chapter shall not for any purpose constitute a suicide or homicide or legally impair or invalidate a policy of insurance or an annuity providing a death benefit, notwithstanding any term of the policy or annuity to the contrary.

(Emphasis added).

The phrase "in accordance with this chapter" unambiguously refers to HRS chapter 327E, titled "Uniform Health-Care Decisions Act (Modified)." Chapter 327E pertains to health-care decisions and the duties of those tasked with their effectuation. See HRS §§ 327E-3 (2010) (titled, "Advanced health-care directives" and describing who may and how to create such a directive); 327E-5 (2010) (titled, "Health-care decisions; surrogates" and describing who may make health-care decisions for a patient); 327E-9 (2010) (titled, "Immunities" and providing

14

civil, criminal and disciplinary immunity to health-care providers or institutions for, *inter alia*, "[c]omplying with a health-care decision of a person apparently having authority to make a health-care decision for a patient, including a decision to withhold or withdraw health care"); 327E-14 (2010) (titled "Judicial relief" and providing that, "[o]n petition of a patient, the patient's agent, guardian, or surrogate, or a health-care provider or institution involved with the patient's care, any court of competent jurisdiction may enjoin or direct a health-care decision or order other equitable relief.").

Contrary to Abella's argument, HRS § 327E-13(b) applies to advance health-care directives and other health-care decision-making procedures and the persons involved. It does not apply to criminal conduct which leads to the need for health-care.

Furthermore, although we ground our holding in the statute's plain language, we note that the legislative history of HRS § 327E-13 confirms our view. See Steigman v. Outrigger Enters., Inc., 126 Hawai‘i 133, 148-49, 267 P.3d 1238, 1253-54 (2011) (noting that although statutory language was plain and unambiguous, the court could resort to legislative history to confirm its interpretation).

HRS § 327E-13 was enacted in 1999. 1999 Haw. Sess. Laws Act 169, § 1 at 565, 571. The Legislature's Conference Committee Report states, in relevant part, that "[t]he purpose of this bill is to replace chapter 327D, Hawaii Revised Statues, by enacting the Uniform Health Care Decisions Act." Conf. Comm. Rep. No. 80, in 1999 House Journal, at 945, 1999 Senate Journal, at 874. Standing Committee Report No. 1102 from the Senate Committee on Health and Human Services also states:

> [t]his measure is intended to replace chapter 327D, Hawaii Revised Statutes, relating to medical treatment decisions which was first enacted in 1986 and has not been revised since 1992. In the intervening years, medical science has advanced tremendously and medical ethics has developed correspondingly. This measure brings medical treatment decisions into today's world of advances in medicine, patient rights, and attitudes towards dying.

S. Stand. Comm. Rep. No. 1102, in 1999 Senate Journal, at 1420 (emphasis added).

There is nothing in the legislative history to suggest that HRS § 327E-13(b) was intended to absolve defendants of alleged criminal conduct which necessitated that a victim receive medical treatment in the first place.

Based on the foregoing, we reject Abella's argument based on HRS § 327E-13(b).

## C.    Mistrial

Abella's last point of error is that his motion for mistrial should have been granted due to prosecutorial misconduct.  Abella cites the State's attempts on cross-examination to have him comment on why he did not report the first fight with Higa to the police.  The following transpired at trial:

> [THE STATE]  So when you go towards Fort Street Mall, you didn't go -- you didn't go up Smith?  All the places to go, you didn't go up Smith; right?
>
> [ABELLA]  No.
>
> [THE STATE]  You didn't go down Smith?
>
> [ABELLA]  No.
>
> [THE STATE]  You didn't go westbound or to the left toward -- back towards River of Life?
>
> [ABELLA]  No.
>
> [THE STATE]  Did you know there's a police station there?
>
> [ABELLA]  Yes.
>
> [THE STATE]  Okay.  You didn't go to the police station?
>
> [ABELLA]  No.
>
> [THE STATE]  You could have gone to the police station; right?
>
> [DEFENSE COUNSEL]  Objection.  That's argumentative.
>
> THE COURT:  Sustained.  The jury is to disregard the question.
>
> [THE STATE]  You could have reported to the police that this 57-year-old guy threatened you?

[DEFENSE COUNSEL]   Your Honor, I'm going to object again. Argumentative.

THE COURT:   Form of the question.   It's sustained.

[THE STATE]   Did you report to the police that night that this 57-year-old man had threatened you?

[ABELLA]   Yeah, when they arrested me.   I said -- I told them that I got assaulted first.

[THE STATE]   Did you on your own make a report?

[ABELLA]   No.

[THE STATE]   Did you make a report that this 57-year-old man had thrown two punches so fast that you couldn't respond in time, that you --

[ABELLA]   That's what --

[DEFENSE COUNSEL]   Your Honor, I'm going to object.   Can we approach the bench?

THE COURT:   Okay.   You may approach.

(Bench conference.)

[DEFENSE COUNSEL]   I'm going to move for a mistrial.   He's commenting on his right to remain silent.   That's basically what he's doing, you never talked to the police, you never filed a report.

THE COURT:   [The State].

[THE STATE]   I will -- I will withdraw the question.   Ask the Court to strike the answers.

THE COURT:   Okay.   Also --

[THE STATE]   And instruct the jury to disregard.

THE COURT:   Okay.   All right.   Motion for mistrial is denied at this time.   I'll ask -- I'll order them to disregard the questions relating to whether he reported --

[THE STATE]   And I'll move on.

THE COURT:   -- his interaction with Mr. Higa.

(Bench conference concluded.)

THE COURT:   Members of the jury, you are to disregard the questions related to whether Mr. Abella reported any incident to the police and any responses that he made in relation to those questions.   You may move on.

Abella's appellate briefs do not point to any cases supporting a mistrial in similar circumstances.   We note that the instant case is distinguishable from State v. Tsujimura, 140

17

Hawai'i 299, 400 P.3d 500 (2017). In Tsujimura, the Hawai'i Supreme Court held that it is unconstitutional to use prearrest silence as substantive evidence of a defendant's guilt. Id. at 312, 400 P.3d at 513. Specifically, "[p]roscribing the use of prearrest silence that occurs at least as of the time that a person has been detained is . . . consistent with the well-established tenet that a person being questioned by a law enforcement officer during an investigatory stop is not obliged to respond." Id. at 313, 400 P.3d at 514 (internal quotation marks omitted) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).

Here, the State's cross-examination of Abella pertained to his actions prior to being detained by police. It addressed Abella's testimony that he had been hit first and whether he had sought to report the matter to the police. The State's questions sought to impeach Abella's self-defense argument, rather than provide substantive evidence of his guilt.

Even if the State's questioning was improper, the Circuit Court took immediate action by instructing the jury to disregard the questions about whether Abella reported any incident to the police and any of his responses to those questions. In short, the Circuit Court provided a prompt curative instruction. Sawyer, 88 Hawai'i at 329 n.6, 966 P.2d at 641 n.6. "A jury is presumed to follow a court's instructions precisely because a jury is likely to perceive a court's statements of the law as the accurate law to apply." State v. Souza, 142 Hawai'i 390, 404, 420 P.3d 321, 335 (2018).

Finally, we consider the strength or the weakness of the evidence against Abella. Sawyer, 88 Hawai'i at 329 n.6, 966 P.2d at 641 n.6. In this case, three witnesses testified that they saw Abella hitting Higa on the head, Dr. Steinemann testified that Higa's hematoma was "deadly" without emergency surgery, and Drs. Oshiro and Happy testified that the cause of Higa's death was his hematoma, not other causes. Abella himself

testified, pursuant to his self-defense argument, that he was "swinging wild" at Higa and hit Higa's head three times.

Given these circumstances, the Circuit Court did not abuse its discretion by denying Abella's motion for a mistrial.

**IV. Conclusion**

For the reasons discussed above, we affirm the Judgment Guilty Conviction and Sentence entered by the Circuit Court of the First Circuit.

On the briefs:

Dana S. Ishibashi,
for Defendant-Appellant.

Brandon H. Ito,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.